**STATE of Tennessee, Appellee,**

v.

**Charles Daniel GRAY, Appellant.**

Court of Criminal Appeals of Tennessee, at Knoxville.

June 5, 1997.

Permission to Appeal Denied by Supreme Court Dec. 8, 1997.

Mark E. Stephens, Public Defender, Leslie Nassios, Asst. Public Defender, Knoxville, for Appellant.

John Knox Walkup, Attorney General and Reporter, Robin L. Harris, Asst. Attorney General, Nashville, Randall E. Nichols, District Attorney General, Robert L. Jolley, Jr., Asst. District Attorney General, Knoxville, for Appellee.

## OPINION

PEAY, Judge.

The defendant was indicted on September 21, 1994, for the second-degree murder of Shirlene Miller. After five days of trial, a jury convicted him of the indicted offense. A sentencing hearing was held, and the defen-

dant was sentenced to twenty-five years in the Tennessee Department of Correction.

In this appeal as of right, the defendant raises the following issues:

1. The evidence was insufficient to support the jury's verdict of second-degree murder.

2. The trial court's instructions to the jury regarding "cause of death" were improper and should result in a new trial.

3. The cumulative errors of the trial court deprived the defendant of a fair trial.

 A. The trial court erred in admitting a plastic bag into evidence without disclosing the bag's contents.

 B. The trial court erred in admitting certain photographs of the victim.

 C. The trial court erred in allowing the State to play the defendant's taped statement in a prejudicial manner.

 D. The trial court erred in refusing to excuse certain jurors for cause.

 E. The trial court erred by holding court during exceedingly late hours.

4. The conduct of the prosecutor deprived the defendant of a fair trial.

5. The defendant's sentence is excessive.

After a review of the record, we find no merit to any of the above issues and affirm the judgment of the court below.

On October 1, 1992, the defendant called 911 and asked for assistance at his home on Glen Oaks Drive in Knoxville. When officers arrived shortly before 9:00 a.m., the defendant told them he thought his fiancée, Shirlene Miller, was dead. Officers found the victim lying on her back on a couch in the home's living room. She was wearing nothing but panties, which appeared to be on inside out. The defendant told the officers that he had awakened that morning and found the victim lying on the screened porch. He moved her to the couch, attempted CPR, and then called 911 when he realized the victim was not alive.

Officer Cynthia Gass and Criminal Investigator Stan McCroskey investigated the scene where the victim was found. At the defendant's trial, Gass testified that she had seen a large wet spot with blood on it on the carpet of the screened porch. She testified that it had appeared as though someone had tried to clean the area. While she testified that she had seen a vacuum cleaner nearby, she did not observe any other cleaning tools. She further testified that she had seen the defendant and observed that he had vomitus in his beard but she did not recall having seen any marks on the defendant's body.

McCroskey testified that he had examined the victim's body as it was lying on the couch. Her body was covered with bruises from head to toe. He discovered blood on the lower right lobe of her head and swelling in the upper left lobe. He also detected a mucus-like substance next to the victim's head and mouth. In his investigation of the house, McCroskey examined a blouse that was found hanging on a coat tree in the front entry to the home. The blouse appeared to have blood stains on the front left panel and on the shoulder. The buttonhole flap was torn from the chest area to the seam of the sleeve. A pair of jeans with a tear in the right pocket was found wadded up on the floor. McCroskey testified that no lab analysis had been performed on either the blouse or the jeans. A broken necklace was also found on the floor of the living room.

McCroskey also testified that a white plastic bag with what appeared to be blood on the outside had been found under the concrete steps which led to the outdoor pool. The bag contained marijuana. No lab analysis was performed on the bag. McCroskey testified that other items seized from the house included a metallic candle holder, broken pieces of glass that were found in the trash can, a second candle holder that was retrieved from the front yard, two black candles, and the vacuum cleaner. He further testified that a lab analysis had revealed no evidence of blood on the brush of the vacuum and no evidence of blood or hair on the metal candle holder. The defendant's fingerprints were found on the broken glass, but no fingerprints could be taken from the metallic candle holder.

As to the large wet spot on the screened porch, McCroskey testified that he had detected a large amount of water on the carpet and thought that it looked as though some-

one had attempted to remove the blood stain. He testified that he also had seen a rag and some paper towels near the steps leading to the porch area and a pail with what appeared to be blood splatters on the outside. None of these items were seized by McCroskey. However, a portion of the carpet was removed and taken as evidence.

McCroskey testified that after investigating the scene of the victim's death, he had asked the defendant to accompany him to the police department to give a statement. The defendant agreed and later signed a form waiving his rights. McCroskey tape recorded the interview he had with the defendant, and it was this tape recording that the State played at trial for the jury. In the interview, the defendant said that he and the victim had been living together for the last few months and had been planning to get married at the end of the year. He said that on the night before he discovered the victim's body, he and the victim had had a few drinks at the bar in the Holiday Inn. However, he said that he did not think either he or the victim was drunk. He also said that although they had fought in the past, they did not have a fight on the night of her death. He said he went to bed around midnight and that the victim had accompanied him, wearing only her panties. He said he heard nothing during the night, and that he awoke around 8:00 a.m. to find the victim not in the bed with him. This was not unusual, he said, because he snores and the victim often sleeps in the living room. However, when the defendant went to look for her in the living room, he said he discovered her lying on the porch. He said the victim was unresponsive and had no heartbeat. He said he then picked her up and carried her to the couch. When he did this, he said he felt blood on the back of her head. He then called 911.

McCroskey testified at the trial that at the time of the interview, he could smell alcohol on the defendant and that he seemed hung over. He further testified that the defendant had been upset that he was being interviewed, but that he was not crying and was not "emotionally upset." At the conclusion of the interview, the defendant was not detained. He was not arrested until nearly two years later in September 1994.

Harry James Rippon, Jr., an associate of the defendant, testified at the trial that the defendant had confided in him in October 1993, approximately a year after the victim's death. Rippon testified that the defendant had told him that on the night of September 30, 1992, the defendant and the victim had been partying and drinking, and that when they returned home, they began to fight. Rippon further testified that the defendant had told him that he and the victim were hitting each other when he got tired of the situation and pushed her away. Rippon testified that the defendant said that after pushing the victim, he went to bed. Rippon further testified that the defendant had said he did not mean to kill the victim. Rippon was out of town at the time of the victim's death and had no personal knowledge as to what had occurred. He testified that his knowledge was derived solely from what the defendant had told him.

Dr. Anthony Kattine, a pathologist at the University of Tennessee, performed an autopsy on the victim's body. At the trial, he testified at length about the victim's injuries and their possible causes. He testified that the victim had many external injuries including a 4.5 cm × .6 cm laceration on her scalp, abrasions above her right eye, on her back and right side, on her hip bone and on her thighs, discoloration of her left breast, bruises on her right breast, marks on her forearms and wrists, and a hemorrhage of the muscles that open and close one's mouth. He further testified that the victim's skull had been fractured and that she had evidence of hemorrhaging on her neck. He testified that he had found small oval marks on her neck which would be consistent with being grabbed by someone's fingers. The victim also had several internal injuries including hemorrhaging of the small bowel and left breast.

Dr. Kattine testified that a very, very severe blow to the head had likely been the cause of the skull fracture. Likewise, he testified that the injury to the small bowel had likely been caused by a blunt blow to the abdomen while the victim was in a relatively

fixed state and the injury to the breast had also likely been caused by a severe blow. Kattine further testified that the stippled or disrupted pattern of the injuries on her body were consistent with the pattern on the metallic candle holder.

Dr. Kattine testified that the victim had had vomitus in her trachea tree indicating that she had aspirated, or in other words, she had pulled vomitus into her airways. He explained that aspiration can occur when a person is intoxicated and vomits, when a person has lost consciousness due to injuries and vomits, or when a person has a head injury which increases the pressure on the brain, causing a person to vomit. As to the victim's cause of death, Dr. Kattine testified that she had been severely beaten and that the terminal injury was the blow to the back of her head which fractured her skull, causing hemorrhaging and aspiration. He added that the intoxicants in her body contributed to her death. He further testified that the injury to her skull was linear, thus making it hard, but not impossible, to imagine that a fall could have produced such an injury. He testified that the victim had no injury on the opposite side of her brain from where she received this injury, indicating that her head was in motion when she received the blow, not that she struck her head against an immovable object such as the floor.

On cross-examination, Dr. Kattine testified that he had found marijuana, alcohol, and Doxepin, a sedative, in the victim's body. The victim had a blood alcohol content of twenty-four hundredths of one percent (.24%). As to the effects these intoxicants had on the victim, Dr. Kattine testified that she would have lost a lot of coordination and that the alcohol could have made bruising more likely. He also testified that while some of the victim's injuries were consistent with the pattern on the candle holder, he could not say beyond a reasonable doubt that the candle holder was the cause of those injuries.

At the conclusion of Dr. Kattine's testimony, the State rested. The defense then began its case with the testimony of Dr. William F. McCormick, professor and head of forensic pathology at East Tennessee State University Medical School and Deputy Chief Medical Examiner for the State of Tennessee. Dr. McCormick testified that he had not been present at the victim's autopsy and that he had never personally viewed the victim's body. Instead, he reviewed numerous reports and photographs provided to him by the defense. He testified that he had reviewed the autopsy report, toxicology reports, photographs from the scene and the autopsy, police incident reports, and FBI reports. From this information, he determined that the victim had suffered from a decelerated head injury, such as a fall. Unlike Dr. Kattine, Dr. McCormick testified that the trauma to the victim's head had resulted from falling against an immovable object, rather than her head being in motion and being struck by an object. Dr. McCormick testified that he had reached this conclusion due to the appearance of the abrasion surrounding the laceration in the scalp. He further testified that to a reasonable degree of medical certainty the victim's death had been caused by the combination of the brain depressing effects of the intoxicants and the hemorrhaging of the brain caused by a head injury received in a fall. However, he did testify that the metallic candle holder could have caused the skull injury if a person had been swinging it very hard. As to the bruises on her body, he said they too were consistent with a fall but that they were not received in a single fall. He testified that the victim would have had to have fallen at least three times. He added that some of her bruises were typical of an intoxicated person repeatedly bumping into objects. Dr. McCormick further testified that the marks on the victim's neck had not been typical of marks left by fingers. He testified that the victim's larynx was not crushed and that it was his conclusion that she was not strangled.

At the conclusion of Dr. McCormick's testimony, the defense rested. The defendant did not testify. The jury then found the defendant guilty of second degree murder in the death of Shirlene Miller.

## I. SUFFICIENCY

As his first issue, the defendant claims that the evidence was insufficient to find him

guilty beyond a reasonable doubt of second-degree murder. A defendant challenging the sufficiency of the proof has the burden of illustrating to this Court why the evidence is insufficient to support the verdict returned by the trier of fact in his or her case. This Court will not disturb a verdict of guilt for lack of sufficient evidence unless the facts contained in the record and any inferences which may be drawn from the facts are insufficient, as a matter of law, for a rational trier of fact to find the defendant guilty beyond a reasonable doubt. *State v. Tuggle,* 639 S.W.2d 913, 914 (Tenn.1982).

When an accused challenges the sufficiency of the convicting evidence, we must review the evidence in the light most favorable to the prosecution in determining whether *"any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."* *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). We do not reweigh or re-evaluate the evidence and are required to afford the State the strongest legitimate view of the proof contained in the record as well as all reasonable and legitimate inferences which may be drawn therefrom. *State v. Cabbage,* 571 S.W.2d 832, 835 (Tenn.1978).

Questions concerning the credibility of witnesses, the weight and value to be given to the evidence, as well as factual issues raised by the evidence are resolved by the trier of fact, not this Court. *Cabbage,* 571 S.W.2d 832, 835. A guilty verdict rendered by the jury and approved by the trial judge accredits the testimony of the witnesses for the State, and a presumption of guilt replaces the presumption of innocence. *State v. Grace,* 493 S.W.2d 474, 476 (Tenn.1973).

■ The defendant contends that the State did not prove beyond a reasonable doubt that he committed a "knowing killing." T.C.A. § 39–13–210(a)(1). " 'Knowing' refers to a person who acts knowingly with respect to the conduct or to circumstances surrounding the conduct when the person is aware of the nature of the conduct or that the circumstances exist. A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result."

T.C.A. § 39–11–302(b). A person can act knowingly irrespective of his or her desire that the conduct or result will occur. *See State v. Rutherford,* 876 S.W.2d 118, 120–21 (Tenn.Crim.App.1993); T.C.A. § 39–11–302(b) Sentencing Commission Comments (1989).

■ In this case, the defendant claims the evidence was insufficient to prove that he committed a knowing killing. However, after reviewing the evidence adduced at trial, we believe that the jury could have reasonably inferred that the defendant committed a knowing killing of the victim. At trial, a witness testified that the defendant had admitted to pushing the victim but that he had not meant to kill her. Furthermore, the crime scene provided evidence as to how the victim was killed as did the severe and numerous bruises on the victim's body. As for expert testimony, the defendant offered the testimony of Dr. McCormick to show that the victim had caused her own death by way of a traumatic fall. The State, on the other hand, offered the testimony of Dr. Kattine that the victim's death was a result of being forcefully struck by a blunt object, most likely a metallic candle holder from the defendant's house. By convicting the defendant, the jury obviously chose to believe the State's witnesses and to credit the testimony from Dr. Kattine over that of Dr. McCormick. It is the exclusive job of the jury to judge the credibility of witnesses. *State v. Bigbee,* 885 S.W.2d 797, 804 (Tenn.1994). The jury chose to reject the defendant's theory that a fall caused the victim's death, and this choice is amply supported by the evidence.

Thus, crediting the State's witnesses as we must on appeal, we conclude that the evidence is sufficient to sustain the defendant's conviction. In viewing the evidence in the light most favorable to the State, it appears that the defendant and the victim had been drinking on the night of her death and had begun to argue. They engaged in physical fighting and after striking the victim numerous times, the defendant delivered a violent and ultimately deadly blow to the victim's head. The defendant knowingly engaged in this conduct, and he should have been aware of the consequences of such conduct. That

he may or may not have intended the consequences is irrelevant. As there is sufficient evidence to support the defendant's conviction, this issue is without merit.

Within his sufficiency argument, the defendant further challenges the validity of the conviction by alleging that the jury was not dispassionate about its verdict because the victim's family sat in the front row of the courtroom during the trial. The defendant simply makes this conclusory statement without citations to the record or to any authority for support.[1] By failing to articulate reasons to support his conclusory statement, the defendant has waived this issue. Rules of the Court of Criminal Appeals of Tennessee 10(b); *State v. McKay*, 680 S.W.2d 447, 454 (Tenn.1984), *cert. denied*, 470 U.S. 1034, 105 S.Ct. 1412, 84 L.Ed.2d 795 (1985); *see also* T.R.A.P. 27(a)(7).

■ The defendant further complains that the jury could not have weighed and reviewed all of the evidence because the members deliberated only an hour before announcing the verdict. The length of a jury's deliberation has no bearing on the "strength or correctness of [its] verdict or the validity of [its] verdict." *Anglin v. State*, 553 S.W.2d 616, 620 (Tenn.Crim.App.1977). *See also State v. Caldwell*, 656 S.W.2d 894, 897 (Tenn.Crim.App.1983)(finding no indication of a predisposition against the defendant where the jury deliberated for twenty-six minutes before finding guilt). This complaint has no merit.

## II. JURY INSTRUCTIONS

■ The defendant alleges that the trial court committed reversible error when it instructed the jury on cause of death. The defendant complains that this instruction, in addition to the instruction on "knowing", confused the jury and effectively shifted the State's burden of proof as to the element of "knowing." The trial court's instruction included the following language:

When a wound from which death might ensue is inflicted with intent to kill, you may infer that death following that wound was caused by such wound. If you so infer, the defendant should show that death resulted from some other cause not attributable to the defendant. However, the burden of proof never shifts and is always upon the state to prove beyond a reasonable doubt that the death of the deceased was brought about by the unlawful act of the defendant.

The defendant cites *State v. Ruane*, 912 S.W.2d 766 (Tenn.Crim.App.1995), in which the above language was also used to instruct the jury. In *Ruane*, the case was remanded for a new trial because the trial court failed to instruct the jury on all the possible lesser included offenses. A panel of this Court suggested that on remand, the above language be deleted from the jury instructions in order to avoid misleading or confusing the jury concerning the burden of proof on the issue of causation. *Ruane*, 912 S.W.2d at 776–77.

The above language used in *Ruane* and in the case *sub judice* was based on former pattern jury instruction T.P.I.Crim. 37.11.[2] Similar language was also used and then challenged on appeal in *State v. Kenneth Patterson Bondurant*, No. 01C01–9501–CC–00023, Giles County, 1996 WL 275021 (Tenn. Crim.App. filed May 24, 1996, at Nashville). In *Bondurant*, this Court concluded that while the language is not favored today, the instruction does not rise to the level of a constitutional deprivation. We agree with the reasoning in *Bondurant* and conclude that using the instruction in question did not deprive the defendant of any constitutional right. Therefore, we conclude that any error in the instruction was harmless. Tenn. R.Crim. P. 52(a).

## III. DEPRIVATION OF A FAIR TRIAL

The defendant next argues that the cumulative errors in the trial deprived him of a

---

1. The only citation to the record on this issue is to a comment made by the trial judge at the motion for a new trial. Neither this comment, nor anything else in the record, supports the defendant's conclusion. We find no facts in the record supporting the defendant's conclusion.

2. This instruction appeared in the 1988 edition of Tennessee Pattern Jury Instructions, but it is not included in later editions.

fair trial. We find no merit to any of these alleged errors, and therefore, conclude that the defendant did in fact receive a fair trial. Nonetheless, we shall address each of his arguments.

### A. Admissibility of Plastic Bag

The defendant complains that the trial court erred when it allowed the State to introduce into evidence a photograph of a plastic bag without disclosing the bag's contents. The bag in question was found under the concrete steps leading to the defendant's outdoor pool. The bag had blood on the outside and was taken from the crime scene for this reason. However, Officer McCroskey testified that the defendant had admitted to the police that he had placed the bag under the steps after calling 911 because the bag contained marijuana.

In pre-trial motions, the defense sought to keep the bag and its contents out of evidence on the grounds that it was not relevant and that the prejudicial effect of the evidence outweighed any probative value that the evidence may have had. The trial court held that the bag could be introduced because it was part of the crime scene and its probative value outweighed any prejudicial effect. At trial, the State sought to introduce only a photograph of the bag without disclosing its contents. Thus, the defendant alleges the State misled the jury by suggesting that the defendant hid a bloody bag outside his house in an effort to conceal evidence. As a result, the defendant complains that he was "forced" to admit into evidence the contents of the bag in order to explain the bag's existence. That the bag contained marijuana was disclosed by Officer McCroskey during his cross-examination by the defendant. The defendant contends that the admission of the bag and its contents confused the issues in the case and misled the jury.

Tennessee Rule of Evidence 401 provides that relevant evidence is that which has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." The State's theory was that the defendant attempted to clean up the murder scene prior to the arrival of the police. A hidden plastic bag with what appeared to be blood on it certainly has a tendency to prove this fact. The admission of evidence is largely discretionary with the trial judge, and her discretion will not be disturbed on appeal unless there is clearly an abuse of that discretion. *State v. Hayes,* 899 S.W.2d 175, 183 (Tenn.Crim.App.1995). Here, we see no reason to disturb the trial court's ruling. That the defendant was "forced" to reveal the contents of the plastic bag does not alter our determination. The bag was relevant in that it was evidence of the defendant's conduct after the death of the victim. We find no evidence that informing the jury the bag contained marijuana prejudiced the defendant to the point that he did not receive a fair trial. We note, however, that even if it were error to admit the photograph of the bag into evidence, it was harmless error. Tenn. R.Crim. P. 52(a).

### B. Admissibility of photographs

The defendant complains that the trial court abused its discretion when it admitted two autopsy photographs of the victim at the conclusion of Dr. Kattine's testimony. During his testimony, Dr. Kattine referred to several slides taken during the autopsy. These slides were admitted into evidence, yet they were not part of the record on appeal. Two photographs complained about by the defendant were also admitted and passed to the jury. The defendant complains that these two photos were cumulative and should not have been passed to the jury.

The photographs in question, exhibit numbers 15 and 17,[3] were also apparently introduced through Dr. Kattine. However, the photos had been the subject of earlier discussion when the defendant objected to introducing the photographs through Officer McCroskey. At that time, defense counsel stated,

---

3. Exhibit 15 was an autopsy photo of the victim's head and torso areas. Exhibit 17 was an autopsy photo of the victim's right side area. Both photos depicted the numerous bruises and abrasions sustained by the victim.

At this point I have not raised any objections to, and don't intend to raise any objections to the slides and photos that [the State] has shown me, of the injuries to [the victim's] body, because I think, under the law, that they are relevant to show, ah, you know, the number of them, and the nature of them, and relevant to Dr. Kattine's testimony.

■ When the photos were later used during Dr. Kattine's testimony, the defendant objected to passing them to the jury on the grounds that the photos were cumulative of the previously introduced slides. He now complains that the trial court erred by allowing the photos to be introduced and passed to the jury. We see two problems with this argument. First, it appears that the photos had already been the subject of much discussion and defense counsel had stated she had no objection to the photos other than through whom they were being introduced. The photos were later introduced through Dr. Kattine as requested by the defendant. That the defendant did not object to the content of the photographs waives this issue. *See State v. Killebrew,* 760 S.W.2d 228, 235 (Tenn. Crim.App.1988); T.R.A.P. 36(a).

■ Second, because the defendant did not include the slides in the record, this Court has no way of evaluating whether the photos were cumulative of that depicted in the slides. Without this evidence preserved in the record, we are precluded from considering the issue. T.R.A.P. 24(b); *State v. Roberts,* 755 S.W.2d 833, 836 (Tenn.Crim. App.1988). Furthermore, we note that a trial judge has much discretion in allowing a photograph into evidence. *Cagle v. State,* 507 S.W.2d 121, 132 (Tenn.Crim.App.1973). It is difficult to imagine that the defendant would have been able to demonstrate the necessary abuse of discretion in order to prevail on this issue.

### C. Defendant's Edited Statement

■ The defendant next complains that he was prejudiced at trial by the manner in which his taped statement to the police was played to the jury. The tape had to be stopped and re-started by the trial judge in order to omit information that was not elicited from the defendant and was irrelevant and possibly prejudicial. On the Friday afternoon prior to the Monday morning trial date, the defendant requested that the State redact the defendant's statement in order to omit these objectionable portions. When the State reported that it was unable to comply with the request because of the lateness of the request and a lack of technical equipment, the trial judge determined that she would operate the tape recorder and would personally stop the tape prior to the objectionable portions.

Prior to playing the tape at trial, the trial judge explained to the jury,

> You are going to have to bear with us just a little bit. There were, the reason why I'm playing this for you, is that there were a couple of extraneous comments made by officers, that have nothing to do with Mr. Gray's statement, that are not appropriate to part of the record, and so I am going to stop the tape and start the tape.

The trial transcript reflects that the tape was stopped once to identify voices and a second time to omit the prejudicial portions. However, the transcript of the defendant's statement, which was passed to the jury, reflected three pauses. The defendant complains that this method of playing the tape raised a "red flag" to the jury that the deleted material was prejudicial to his case.

Having reviewed the record, we cannot conclude that the defendant was in any way prejudiced by the manner in which the tape was played. The trial judge gave the jury an adequate explanation as to why the tape would be stopped and re-started. We note, however, it certainly would have been preferable to have had the tape properly redacted. This might have been easily accomplished had the defendant filed his motion earlier. This issue.has no merit.

### D. Selection of Jury

The defendant next complains that the trial court erred in refusing to excuse two jurors for cause. Thus, the defendant alleges he was forced to exhaust all his peremptory challenges and "proceed to trial with an incompetent juror."

The defendant alleges that the trial court erred when it refused to remove juror Shephard for cause. During voir dire, Ms. Shephard said she had read about the defendant's case in the paper and had seen a news report on television, but that she did not really recall any of the facts. She told the court that she did not think her opinion of the case would be in any way affected by the news story. Ms. Shephard also told the court that in her opinion it is best if a defendant takes the stand and explains himself. She also said she might be inclined to believe a police officer over a lay person because two members of her family are police officers. However, she said she would try her "very hardest" to follow the court's instructions if seated on the jury. The defendant asked that Ms. Shephard be excused for cause, but the court refused. The defendant then used a peremptory challenge to remove Ms. Shephard from the jury.

The defendant alleges that having used all his peremptory challenges, he was then "forced" to accept juror Sharp. The defendant asked that Mr. Sharp be excused for cause, but the court refused the request. The defendant alleges that because he was forced to use a peremptory challenge for juror Shephard, he had none left to use for juror Sharp and as a result, Mr. Sharp subsequently served as a member of the jury panel. The defendant complains that Mr. Sharp should not have been on the jury because he had heard a news report about the victim's death on a local radio station. When questioned about this, Mr. Sharp said the report really "didn't register" and that he had not formed an opinion about the case.

■■■■■ The resolution of this issue depends not so much on the trial court's ruling concerning Ms. Shephard as it does upon the examination and qualifications of Mr. Sharp, the juror the defendant was "forced" to accept. Since Ms. Shephard did not serve on the jury, "any error in refusing to excuse [her] for cause in and of itself does not entitle the defendant to a new trial unless the jury that ultimately heard the case was not fair and impartial." *State v. Howell,* 868 S.W.2d 238, 249 (Tenn.1993) (citation omitted). Therefore, we must look to the qualifications of juror Sharp, whom the defendant had to accept after his challenge for cause was denied. Accordingly, we have examined the voir dire of Mr. Sharp and have "found nothing at all suggestive of bias or prejudice." *See State v. Michael Sanders,* No. 2, Hardeman County, 1989 WL 14262 (Tenn.Crim. App. filed Feb. 22, 1989, at Jackson). Mr. Sharp only indicated that he had heard some news accounts of the defendant's pending trial. He unequivocally stated that he had not formed any opinion about the case. A prospective juror's mere exposure to publicity is not constitutional error. *State v. Blakely,* 677 S.W.2d 12, 17 (Tenn.Crim.App.1983); *Lackey v. State,* 578 S.W.2d 101, 103 (Tenn. Crim.App.1978). The fact that a prospective juror has read or has heard some publicity about a case is not sufficient to disqualify him if he is otherwise qualified and he states that he can give the defendant a fair and impartial trial. *Blakely,* 677 S.W.2d at 17.

Mr. Sharp could not even recall any specific details of the publicity to which he was exposed.[4] Such limited exposure is not sufficient to disqualify him from jury service on this case. Thus, we conclude that Mr. Sharp was competent to serve as a juror and that the defendant suffered no prejudice by Mr. Sharp having served on the panel. This issue is without merit.

### E. Late hours of court

The defendant next complains that the trial court erred by holding court "during exceedingly late hours." The defendant states that because the jury was sequestered, the trial court was concerned about holding the jury over the Easter holiday. Presumably because of this concern, the trial continued into the evening on two nights. The record does not reflect what time court adjourned on either of these evenings. At the close of

---

**4.** Two news video clips from television station WATE and one news sound clip from radio station WIVK were included in the record. The video clips stated that the defendant's trial was beginning where he was accused of killing Shir-

lene Miller. One clip reported that subsequent to Miller's death, the defendant had been accused of brutally beating another woman. The radio clip was similar in content.

court on April 12, the trial judge made a reference to the lateness of the hour, but the record does not reflect the specific time. It was apparently some time after the court had taken its dinner break. The jurors were not asked to return the following day until 9:30 a.m. On April 13, the jurors were dismissed for the evening at 7:00 p.m. On the following day, the trial ended and the jurors delivered a verdict.

First, we point out that the defendant has waived this issue by failing to object to continuing court into the evening hours. *State v. Davis,* 872 S.W.2d 950, 953 (Tenn. Crim.App.1993). The record reflects no complaints or objections from either the defendant or the jury.

Although waived, we will briefly address the merits of the defendant's claim. In general, court proceedings in criminal cases should not be held during late night hours unless unusual circumstances require it. *State v. McMullin,* 801 S.W.2d 826, 832 (Tenn.Crim.App.1990); *Hembree v. State,* 546 S.W.2d 235, 242–43 (Tenn.Crim.App. 1976). And even then, court should not be held at late hours if either defense counsel or any juror objects upon reasonable grounds related to the lateness of the hour. *McMullin,* 801 S.W.2d at 832.

In *Seelbach v. State,* 572 S.W.2d 267 (Tenn.Crim.App.1978), the trial judge was concerned with completing the trial before Monday when he was scheduled to be in another court. As a result, court continued until 9:13 p.m. on one night of the trial. This Court held that doing so was reasonable under the circumstances. *Seelbach,* 572 S.W.2d at 271. We reach the same conclusion in the present case. In this case, the record reveals that no objection was heard from defense counsel or the jury, that the jury was given several breaks throughout the day, that the jury reported later in the morning on the second day, and that on the second day court adjourned at 7:00 p.m. While the record does not reflect how late court continued on April 12, we find nothing in the record to suggest continuing past regular adjournment hours was oppressive or unrea-

sonable. *McMullin,* 801 S.W.2d at 831. Therefore, this issue is without merit.

## IV. PROSECUTORIAL MISCONDUCT

The defendant next alleges that the prosecutor engaged in a continuing pattern of misconduct which deprived the defendant of a fair trial. To prevail on such a claim, the defendant is required to show that the argument was so inflammatory or the conduct so improper that it affected the verdict to his detriment. *Harrington v. State,* 215 Tenn. 338, 385 S.W.2d 758, 759 (1965). In reviewing an allegation of improper conduct, this Court should consider several factors including the intent of the prosecutor, the curative measures which were undertaken by the court, the improper conduct viewed in context and in light of the facts and circumstances of the case, the cumulative effect of the remarks with any other errors in the record, and the relative strength or weakness of the case. *Judge v. State,* 539 S.W.2d 340, 344 (Tenn.Crim.App.1976).

First, the defendant contends that the prosecutor improperly referred to the O.J. Simpson case during voir dire. The prosecutor made a remark to potential jurors about the domestic abuse aspect of the O.J. Simpson trial and then further remarked that he hoped this trial would not last as long as the Simpson trial did. The defendant objected to such remarks, and the trial judge instructed the prosecutor to refrain from making such references. While the prosecutor's comment was irrelevant and inappropriate, we do not conclude that it in any way prejudiced the defendant or inflamed the potential jurors.

Second, the defendant contends that the prosecutor intentionally referred to a witness, Henry James Rippon, Jr., as the defendant's "business associate." The defendant argues that this reference was in violation of the court's ruling to keep out any references to drugs, drug dealing, or similar activities. When the defendant objected to the characterization, the trial judge held a sidebar and told the attorneys that it had been her intention to keep out all references to drugs and that the prosecutor's characterization of the defendant and Mr. Rippon as

business associates "intends to mean business of illegal dealings." However, she declined to declare a mistrial and simply instructed the attorneys to refer to the pair as "associates" or "friends."

We find that the trial judge acted properly in not declaring a mistrial. That the jury may have inferred some illegality in the relationship between the defendant and Rippon has not at all been established. We fail to see how this characterization affected the outcome of the trial.

Third, the defendant complains about the motives of the prosecution in introducing into evidence the photograph of the plastic bag. This issue has been fully discussed above and is devoid of merit.

Fourth, the defendant complains about the State's presentation of the evidence and its theory of the case. That the jury chose to believe the State's theory and not the defendant's is not a valid basis for complaint on appeal.

Fifth, the defendant complains about the prosecutor's failure to redact the taped statement of the defendant. This issue has been fully discussed above and is devoid of merit.

■ Sixth, the defendant complains that the prosecutor impermissibly "led" his expert witness on direct examination. While the prosecutor did ask at least three leading questions, he was instructed by the court each time to refrain from doing so. Asking leading questions on direct examination, though objectionable, does not rise to prosecutorial misconduct.

■ And finally, the defendant contends that the State improperly characterized the evidence during closing arguments. The trial judge has wide discretion in controlling the argument of counsel. That discretion will not be interfered with on appeal in the absence of an abuse thereof. *Smith v. State*, 527 S.W.2d 737, 739 (Tenn.1975). We find no such abuse, and likewise find no merit to the defendant's argument.

## V. SENTENCING

■ In his final issue, the defendant complains that his sentence of twenty-five years is excessive. When a defendant complains of his or her sentence, we must conduct a *de novo* review with a presumption of correctness. T.C.A. § 40–35–401(d). The burden of showing that the sentence is improper is upon the appealing party. T.C.A. § 40–35–401(d) Sentencing Commission Comments. This presumption, however, "is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn.1991).

A portion of the Sentencing Reform Act of 1989, codified at T.C.A. § 40–35–210, established a number of specific procedures to be followed in sentencing. This section mandates the court's consideration of the following:

(1) The evidence, if any, received at the trial and the sentencing hearing; (2)[t]he presentence report; (3)[t]he principles of sentencing and arguments as to sentencing alternatives; (4)[t]he nature and characteristics of the criminal conduct involved; (5)[e]vidence and information offered by the parties on the enhancement and mitigating factors in §§ 40–35–113 and 40–35–114; and (6)[a]ny statement the defendant wishes to make in his own behalf about sentencing.

T.C.A. § 40–35–210.

■ In addition, this section provides that the minimum sentence within the range is the presumptive sentence. If there are enhancing and mitigating factors, the court must start at the minimum sentence in the range and enhance the sentence as appropriate for the enhancement factors and then reduce the sentence within the range as appropriate for the mitigating factors. If there are no mitigating factors, the court may set the sentence above the minimum in that range but still within the range. The weight to be given each factor is left to the discretion of the trial judge. *State v. Shelton*, 854 S.W.2d 116, 123 (Tenn.Crim.App.1992).

The Act further provides that "[w]henever the court imposes a sentence, it *shall place on the record* either orally or in writing, what enhancement or mitigating factors it found, if

any, as well as findings of fact as required by § 40–35–209." T.C.A. § 40–35–210(f) (emphasis added). Because of the importance of enhancing and mitigating factors under the sentencing guidelines, even the absence of these factors must be recorded if none are found. T.C.A. § 40–35–210 comment. These findings by the trial judge must be recorded in order to allow an adequate review on appeal.

The defendant complains that the trial court erred in its application of several enhancing factors. The following factors from T.C.A. § 40–35–114 were applied: a previous history of criminal behavior (1); that the victim was particularly vulnerable(4); that the victim was treated with exceptional cruelty(5); and the felony resulted in a death and the defendant has been previously convicted of a felony involving death(11).

 As to factor (1), the defendant has a significant history of criminal behavior. He has been convicted of voluntary manslaughter, assault and battery, and a litany of alcohol and drug-related charges. His criminal behavior spans twenty years. It is quite obvious this factor applies to the defendant.

 As to factor (4), the defendant argues that the victim's intoxication did not make her particularly vulnerable. Tennessee Code Annotated § 40–35–114(4) provides for enhancement of a defendant's sentence when the victim of the offense was "particularly vulnerable because of age or physical or mental disability." The State bears the burden of proving the "victim's limitations rendering him or her particularly vulnerable." *State v. Adams,* 864 S.W.2d 31, 35 (Tenn. 1993). This is a factual issue to be determined by the trier of fact on a case by case basis.

 In this case, the victim had a blood alcohol content of twenty-four hundredths of one percent (.24%). She was also under the influence of marijuana and Doxepin, a sedative. Dr. Kattine testified at trial as to how these intoxicants would have affected the victim. Such severe intoxication makes the application of factor (4) proper. See *State v. Billy Gene Earnest,* No. 01C01–9412–CR–00434, Macon County, 1996 WL 63878 (Tenn.

Crim.App. filed Feb. 13, 1996)(finding victim particularly vulnerable where he had a blood alcohol content of thirty-one hundredths of one percent (.31%) and had difficulty standing); *State v. William Ray Rhodes,* No. 02C01–9406–CC–00124, Henry County, 1995 WL 425046 (Tenn.Crim.App. filed July 19, 1995)(finding victim particularly vulnerable where she had a blood alcohol content of twenty hundredths of one percent (.20%)); *State v. Curtis Anthony Miller,* No. 01C01–9309–CR–00329, Davidson County, 1994 WL 236014 (Tenn.Crim.App. filed June 2, 1994, at Nashville)(finding victim particularly vulnerable where he had a blood alcohol content of twenty-two hundredths of one percent (.22%)).

 As to factor (5), that the victim was treated with exceptional cruelty, the defendant claims that this factor is not supported by the evidence. The evidence adduced at trial shows that the defendant was severely beaten. Dr. Kattine testified that the victim had many external injuries including a laceration on her scalp, abrasions above her right eye, on her back and right side, on her hip bone and on her thighs, bruises on her breasts, and marks on her forearms and wrists. He further testified that her skull was fractured and that she also had several internal injuries including hemorrhaging of the small bowel and left breast.

Enhancement factor (5) is usually found in cases of abuse or torture. See *State v. Davis,* 825 S.W.2d 109, 113 (Tenn.Crim.App. 1991); *State v. Haynes,* 720 S.W.2d 76, 86 (Tenn.Crim.App.1986). We find it is certainly applicable in this case given the traumatic and severe injuries sustained by the victim. See *State v. Holland,* 860 S.W.2d 53, 61 & fn. 18 (Tenn.Crim.App.1993)(finding exceptional cruelty where victim was beaten and bruised all over her body and had received a serious blow to the head).

The defendant also complains that the trial court improperly used enhancement factor (9), possession of a deadly weapon, to enhance the defendant's sentence: The trial judge apparently considered factor (9) in connection with factor (5), but she stated, "There is considerable dispute about the use of a

deadly weapon, and I am not sure what caused those injuries. . . ." Thus, it appears that the trial court gave factor (9) very little or no weight. Thus, we see no reason for complaint. The defendant does not challenge the application of factor (11).

■■ The trial court found no mitigating factors in this case, nor do we after a review of the record. In considering the enhancement factors, we conclude that a sentence of twenty-five years is entirely appropriate. We find no merit to the defendant's argument that the sentence is excessive.

After a review of the record and applicable law, we find no merit to any of the defendant's issues and therefore, affirm the judgment of the court below.

SUMMERS, J., and CORNELIA A. CLARK, Special Judge, concur.