IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs March 20, 2001

## STATE OF TENNESSEE v. MARK A. STACY

**Direct Appeal from the Criminal Court for Polk County**
**No. 00-017     Carroll L. Ross, Judge**

---

**No. E2000-02906-CCA-R3-CD**
**May 9, 2001**

---

The defendant was indicted by a Polk County Grand Jury for first degree murder. Following a two-day trial, he was found guilty of second degree murder, a Class A felony. The trial court sentenced the defendant to twenty-three years as a Range I, violent offender in the Tennessee Department of Correction. In this appeal as of right, the defendant does not challenge his conviction but contends only that his sentence is excessive. Having reviewed the entire record, including the transcript of the sentencing hearing, we conclude that the defendant's issues concerning the length of his sentence are without merit. We affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which JERRY L. SMITH and JOE G. RILEY, JJ., joined.

Charles M. Corn, District Public Defender, and A. Wayne Carter, Assistant District Public Defender, Cleveland, Tennessee, for the appellant, Mark A. Stacy.

Paul G. Summers, Attorney General and Reporter; Angele M. Gregory, Assistant Attorney General; Jerry N. Estes, District Attorney General; and Carl F. Petty, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

The defendant, Mark A. Stacy, was indicted for the first degree murder of Leonard Hamby and was found guilty of second degree murder, a Class A felony, by a Polk County jury. Following a sentencing hearing, the trial court sentenced the defendant to twenty-three years in the Tennessee Department of Correction. In this appeal as of right, the defendant challenges only his sentence, asserting that it is excessive. The defendant specifically alleges that the trial court erred in applying three enhancement factors and in giving undue weight to a fourth. The defendant also alleges that the trial court erred in finding no mitigating factors. Having reviewed the entire record, we affirm the judgment of the trial court.

# FACTS

The proof in this case showed that the defendant, a thirty-seven-year-old former airman in the U.S. Air Force, was living in Farner, Tennessee, on Highway 68 close to the North Carolina line, at the time of the offense. The defendant's trade was carpentry and general remodeling, including painting. Close to Farner, along Highway 123, was a favorite spot of the locals called "D.J.'s Bar," a one-story, wood and stone building with a tin roof set back from Highway 123. Large red, orange, and yellow striped signs announced BEER to drivers coming from the west or east. The entrance for patrons was on the north side of the building, facing the highway. There were two driveways off the highway that led to a gravel parking area to the west of the building. There was also an entrance to the bar on the west side near an ice machine. This entrance was primarily for the use of employees of the bar. The Old Sawmill Road, a gravel road, ran behind the bar on the south side and was indistinguishable from the gravel parking area. There was also a drive-through window for beer, apparently on the south side of the building.

On Thursday, November 4, 1999, the defendant spent the morning working on the house his sister was living in just across the state line in North Carolina. The defendant testified that he had been to the drive-through window at D.J's for beer "a couple times" on November 4. He also testified that he had "been drinking quite a bit of Bacardi rum" and had also smoked a "couple joints" of marijuana prior to his parking his white van at D.J.'s around 3:00 p.m. in the afternoon of November 4. He went into D.J.'s to hang around, "drinking beers and playing pool." When he entered the bar, he saw the victim, Leonard Hamby, sitting at the bar. Hamby was a regular, as were a number of others there at the time.

The defendant and the victim knew each other and even played a few games of pool on this occasion. Nevertheless, there was apparently some bad blood between the two men concerning Hamby's former wife, Helena. The defendant had lent a chrome-plated .20 gauge shotgun to Helena during a time when she and the victim were involved in domestic disputes. Although it is unclear exactly how the altercation between the defendant and the victim started, it is clear that both men were extremely intoxicated.[1] What started as name-calling, with the victim calling the defendant a "yankee," ended up with the defendant on the floor and the victim sitting on top of him with a fist drawn. One regular patron described the following:

> Leonard, he was drunk. He started talking about something. Anyway, Leonard forgot about—he was so drunk he forgot what he was talking about. Well, Mark kind of laughed at him. Well, that made Leonard mad and he started to slap him off the bar stool, but he missed him. He was so drunk he missed him. Well, he kind of shoved Mark off the stool and Mark laid down in the floor. I mean, Leonard didn't hit him hard enough to knock him down because he

---

[1] The record includes official laboratory reports indicating a blood alcohol level of .26% for the victim and .22% for the defendant.

was—Leonard was drunk. And Mark laid down in the floor and wrapped his arms around his head. Well, Leonard fell off the stool, he was so drunk. Then he took a few breaths, panting for breath trying to get up. So he had to crawl to get on top of Mark, and he hit Mark three times in the ribs. And then he seen he wasn't going to fight, and I think he called him a coward son-of-a-bitch.

The bartender, Jeff McCray, intervened, separating the two men. The victim got back on a bar stool, and McCray told the defendant to leave, which he did. McCray testified that it was about 5:30 p.m. when the defendant left the bar following the fight with the victim. McCray heard the defendant's van outside the bar, and so McCray stepped outside the west, employee door. He saw the defendant driving his van in circles in the parking lot, and then he watched the defendant drive out onto Highway 123 and head west toward Ducktown. Some fifteen minutes later, McCray again heard a vehicle outside and, thinking the defendant might have returned, McCray stepped outside the west door again. McCray testified further to the following:

> Q. All right, sir. Where were you — you went out the back door there behind the bar, correct?
>
> A. Yes.
>
> Q. All right. And where was, where was Mr. Stacy?
>
> A. He was sitting in the parking lot in his van. And that's when I walked over and talked to him.
>
> Q. What was he doing? Just sitting there?
>
> A. Yeah.
>
> Q. What did you tell him when you went over there?
>
> A. Well, I, I went out to tell him he needed to go home or I was going to call the law, you know, or something, and that's when he, you know —
>
> Q. Tell us, tell us what happened. Did you tell him to leave?
>
> A. Yes.
>
> Q. What did he say to you?
>
> A. Well, he said, "I'm going to kill him."

McCray noticed that the defendant had a shotgun resting between the front seats. McCray turned and started to walk back to the employee door. Out of the corner of his eye, McCray saw the victim, who was leaving the bar, as he passed the northwest corner of the building and headed straight across the drive to his parked car. At that point, the defendant revved up his engine and accelerated forward, causing gravel to fly. McCray thought the defendant might hit the ice machine on the west side of the building. But, swerving left, the defendant hit the victim with the front left side of the van, knocking his body under the van and dragging it some thirty-five feet across gravel to the paved section of the drive that crossed over a creek before entering Highway 123, where the victim dropped free of the van. The defendant never stopped but drove out to the highway, turning west toward Ducktown. McCray went to the victim and discovered he was "in bad condition, you know. Blood was coming out of his mouth and . . . all tore up." Dr. Ron Toolsie, pathologist at Bradley Memorial Hospital, testified that the cause of death was thoracic crush injury, and that "[w]hen this happens, the lungs collapse, the chest fills up with blood, and the victim is unable to breathe and subsequently dies." The official autopsy report stated the cause of death as "Thoracic crush injury with multiple rib fractures and pulmonary lacerations due to vehicular impact with subsequent dragging."

The defendant testified at his trial and admitted that he was driving the van that hit and killed the victim. The defendant argued that the killing was accidental and that alcohol was to blame.[2]

## ANALYSIS

### Issue:  Whether the Defendant Was Appropriately Sentenced

The defendant does not challenge the determination of the jury that he is guilty of second degree murder in the death of the victim, Leonard Hamby. Rather, the defendant contends that the length of his sentence is excessive.

When an accused challenges the length, range, or manner of service of a sentence, it is the duty of this court to conduct a *de novo* review on the record with a presumption that "the determinations made by the court from which the appeal is taken are correct." Tenn. Code Ann. § 40-35-401(d) (1997). This presumption is "conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). In conducting a *de novo* review of a sentence, this court must consider (a) any evidence received at the trial and/or sentencing hearing, (b) the presentence report, (c) the principles of sentencing, (d) the arguments of counsel relative to sentencing alternatives, (e) the nature and characteristics of the offense, (f) any mitigating or enhancing factors, (g) any statements made by the accused in his own behalf, and (h) the accused's potential or lack of potential for rehabilitation or treatment. See Tenn. Code Ann. §§ 40-35-103

---

[2]While not actually asserting self-defense, the defendant sought to portray the victim as the aggressor in the bar brawl and himself as an insulted and threatened party, simply trying to get out of the victim's way for fear of being harmed.

-4-

(1997) and -210 (Supp. 1999); see also State v. Scott, 735 S.W.2d 825, 829 (Tenn. Crim. App. 1987).

The presumptive minimum sentence for a Class A felony, and the point from which the trial court begins its calculations when determining the appropriate length of a sentence, is the midpoint in the statutory range. See Tenn. Code Ann. § 40-35-210(c) (Supp. 1999). In determining the appropriate sentence for a Class A felony conviction, the sentencing court, if there are enhancing factors but no mitigating factors, may set the sentence above the minimum in that range but still within the range. See id. § 40-35-210(d); State v. Boggs, 932 S.W.2d 467, 475 (Tenn. Crim. App. 1996). "Should there be mitigating but no enhancement factors for a class A felony, then the court shall set the sentence at or below the midpoint of the range." Tenn. Code Ann. § 40-35-210(d). There is no mathematical formula of valuating  factors to calculate the appropriate sentence. See generally Boggs, 932 S.W.2d at 475. "Rather, the weight to be afforded an existing factor is left to the trial court's discretion so long as the court complies with the purposes and principles of the 1989 Sentencing Act and its findings are adequately supported by the record." Id. at 475-76 (citations omitted).

In this case, a sentencing hearing was held on May 30, 2000. The defendant was classified as a Range I offender committing a Class A felony, therefore the appropriate statutory range of punishment was fifteen to twenty-five years. See Tenn. Code Ann. §§ 40-35-101 Sentencing Commission Cmts. and -112(a)(1). The trial court correctly began its determination of the appropriate sentence length for the defendant at the midpoint, or twenty years.

## I.  Enhancement Factors

The trial court applied the following enhancement factors, listed here by statutory number:

(1)  The defendant has a previous history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range;

(5)  The defendant treated or allowed a victim to be treated with exceptional cruelty during the commission of the offense;

(8)  The defendant has a previous history of unwillingness to comply with the conditions of a sentence involving release in the community; and

(9)  The defendant possessed or employed a firearm, explosive device or other deadly weapon during the commission of the offense[.]

Tenn. Code Ann. § 40-35-114(1), (5), (8), and (9).

## A. Enhancement Factor (1)

As to enhancement factor (1), the defendant agrees that the factor does apply to him but asserts that the trial court afforded it too much weight. The record includes, in part, the following convictions by date and offense:[3]

| | | |
|---|---|---|
| 1/26/88 | DUI | Cherokee County District Court |
| 4/26/88 | DUI | Cherokee County District Court |
| 4/26/88 | Driving w/Revoked License | Cherokee County District Court |
| 6/1/91 | DUI | Barberton Municipal Court |
| 6/3/92 | DUI | Municipal Court of Akron |
| 6/3/92 | Evading Arrest | Municipal Court of Akron |
| 6/3/92 | Reckless Driving | Municipal Court of Akron |
| 6/3/92 | Driving w/Suspended License | Municipal Court of Akron |
| 7/25/95 | Disorderly Conduct | Barberton Municipal Court |
| 9/10/96 | DUI | Municipal Court of Akron |
| 9/10/96 | Driving w/Suspended License | Municipal Court of Akron |
| 6/18/96 | Possession of Marijuana | Horry County Traffic Court |
| 6/18/96 | Traffic Offense | Horry County Traffic Court |

In addition to these offenses, the defendant had bench warrants issued against him for failure to appear to serve a jail sentence in 1993; contempt in 1993; failure to appear in 1995; failure to appear in 1996; and contempt in 1996. According to the defendant, this record is not such that the trial judge should have placed great emphasis on it. The trial court, in applying factor (1), stated that the number of DUI offenses was what impressed it. The trial court also noted the direct relationship between the history of DUIs and the events of the murder in this case. The trial court stated, "I want the record to reflect that I place greater emphasis on (1) and (8) in anything that I do in my sentencing here." We conclude that the trial court did not abuse its discretion in placing great emphasis on the extensive criminal record of the defendant.

## B. Enhancement Factor (8)

As to factor (8), the defendant argues that the trial court relied on the same facts in applying this factor as in applying factor (1), implying unfair "double dipping." We disagree. The trial court noted the unwillingness of the defendant to comply with the conditions of the sentences he received based on the convictions that support factor (1). The trial court stated:

> Part of those same reasons, and for a part of those same reasons, I find the State has proven subparagraph (8) under the enhancement factors statute in that the defendant has a previous history of

---

[3]These offenses appear to have been committed in Akron, Ohio; Barbeton, Ohio; Cherokee County, North Carolina; and Horry County, South Carolina.

unwillingness to comply with the conditions of a sentence involving release in the community. Part of those conditions were these rehab programs which he did not successfully complete for the reasons that Ms. Wolf [Investigating Officer for presentence report] testified to, and there were other statements in the presentence report and the evidence produced here at trial today that he has had a history of tending to ignore authority when it comes to these alcohol problems. He repeatedly gets back into trouble, doesn't avail himself of the programs available to him, so the Court finds that subparagraph (8) of that is applicable as an enhancement factor."

Our review of the presentence report shows that the defendant has apparently been placed on probation at least five times prior to the incident which is the basis for this appeal. It appears that several months after he was placed on one year's probation in 1988 for a DUI conviction in Cherokee County, North Carolina, he was convicted in the same court for DUI and driving on a revoked license, and, after serving a jail sentence and paying fines and costs, he was placed on three years' probation. One year later, while still on probation, he was convicted in a different court of violation of the driver's license law and paid a fine. Approximately two months after the defendant had completed the three years' probation, he was convicted of another DUI. In 1992, approximately a year after that conviction, he was convicted of DUI, evading arrest, and reckless driving, receiving sentences consisting of payment of fines, costs, and a one-year suspended sentence. The record shows that he was jailed in 1991 for being in violation of a DUI suspended sentence. Suzanne Wolf, who prepared the presentence report, testified that she contacted the Oriana House in Ohio, where the defendant had been ordered, apparently on several occasions, to undergo alcohol treatment following his various Ohio convictions, and was told that, as to his compliance, "[s]ome of them he did, some of them he didn't."

The defendant relies on State v. Davis, 757 S.W.2d 11 (Tenn. Crim. App. 1987), to support his contention that it is inherently unfair to enhance a sentence based on specific prior convictions and also enhance a sentence based on the failure of the defendant to comply with the terms of the sentences resulting from those same convictions. The defendant's reliance on Davis is misplaced; that case is not analogous to the case here. This court stated in Davis that "the legislature did provide in § 40-35-111 that an enhancing factor may not be used to lengthen a sentence if it has already been used as 'one of the criteria for establishing an especially aggravated offense.'" Id. at 13. No such facts exist in this case. The Sentencing Reform Act of 1989, which is applicable here, specifically permits the trial judge to look both to convictions or instances of criminal behavior under factor (1) and to instances indicating a previous history of unwillingness to comply with sentences involving release into the community under factor (8) in determining the appropriate sentence. The only limitation is that the convictions considered by the trial court in enhancing the sentence length

under factor (1) must not also be convictions used to establish the appropriate statutory range. We conclude that the trial court appropriately applied factor (8) to the defendant.[4]

## C. Enhancement Factor (5)

Next, the defendant argues that the trial court erred by applying enhancement factor (5), that he "allowed a victim to be treated with exceptional cruelty during the commission of the offense." Tenn. Code Ann. § 40-35-114(5). According to the defendant, the evidence adduced at trial fails to support this factor. The trial court's determination as to this factor is unclear from the record. The trial court included factor (5) when summing up: "So I therefore find two enhancement factors in subparagraphs (1) and (8), which I place great emphasis on; two lesser factors in paragraphs (5) and (9)."

Our supreme court has stated that "enhancement factors must be 'appropriate for the offense' and 'not themselves essential elements of the offense.'" State v. Poole, 945 S.W.2d 93, 98 (Tenn. 1997) (quoting Tenn. Code Ann. § 40-35-114). Thus, enhancement factors that are based on facts that prove the offense itself or that establish specific elements of the offense as charged must be excluded from consideration. Id. Nevertheless, "the facts in a case may support a finding of 'exceptional cruelty' that 'demonstrates a culpability distinct from and appreciably greater than that incident to' the crime . . . ." Id. (quoting State v. Jones, 883 S.W.2d 597, 603 (Tenn. 1994)). This court has upheld the application of enhancement factor (5) in a second degree murder case where the facts showed that the defendant's fiancee/victim had "many external injuries including a laceration on her scalp, abrasions above her right eye, on her back and right side, on her hip bone and on her thighs, bruises on her breasts, and marks on her forearms and wrists." State v. Gray, 960 S.W.2d 598, 611 (Tenn. Crim. App. 1997). The victim in Gray also sustained a fractured skull and several internal injuries. See id. While the Gray court noted that factor (5) is most often found in cases of abuse or torture, the court found it "certainly applicable in this case given the traumatic and severe injuries sustained by the victim." Id.

We conclude that enhancement factor (5) is not an element of second degree murder and therefore may be applied where the facts of the case support such a finding. Here, the trial court made no findings to support the factor. Nevertheless, under our *de novo* review, we conclude that the killing of the victim involved more than just being hit and run over by the defendant's vehicle, and nothing more, as the defendant argues. The victim was dragged across a gravel parking lot some

_____

[4]The defendant also argues that his alcoholism negated the possibility of any willfulness in his failure to comply with the conditions of sentences involving his release into the community. The defendant argues that alcoholism is a disease that negates the willful intent required in enhancement factor (8). We note that the letter, placed into evidence by the defendant at the sentencing hearing, written by Dr. William R. Sewell, a psychologist with the Plateau Mental Health Center in Cookeville, Tennessee, sets out two theories of alcoholism: one, that it is a condition under the control of the individual and does not require "medical intervention for the behaviors, producing the effects, to decrease." The other theory is that alcoholism is a disease that "requires medical treatment and can be arrested *assuming the individual maintains abstinence*." The emphasis is this court's. Neither theory relieves the individual from responsibility for choosing to consume alcohol.

thirty-five feet. The defendant never stopped but simply kept going. The victim, although apparently unconscious as a result of the impact and dragging, did not die instantly. According to Barbara Douthitt, a witness immediately on the scene, the victim was in the following condition as a result of being hit:

> There was a big old hole in the side of his head and his pants and legs was swelled, and he was swelling big, and blood and I don't know what and all was coming out of his mouth and out of his nose. He couldn't breathe and somebody turned his head around so he could get his breath.

According to the testimony of Dr. Ronald Toolsie, the victim suffered multiple external "abrasions or scrapes, contusions or bruises, and lacerations or tears. Basically, they were too innumerable to document individually." Dr. Toolsie testified further:

> He had suffered some fairly large gashes or tears to the left side of his scalp beneath his left cheek. He had a large bruise several inches wide to the right side of his trunk or torso. He had multiple long scrape marks where the skin had been essentially scraped off, running down the right side of his leg and buttocks.

We conclude there is evidence of exceptional cruelty separate and apart from the actions which constituted the offense of second degree murder, thus justifying the application of factor (5), which the trial court considered one of the "lesser" factors.

### D. Enhancement Factor (9)

The defendant does not challenge the proof that at the time of the murder he had a loaded .20 gauge shotgun beside him in his van. Rather, the defendant argues that the shotgun was never used and had nothing to do with the fact that the victim was hit and run over by the defendant's van. The trial court rightly noted that the statutory language allows for enhancement where there is possession or use of a firearm. Here, there was uncontroverted proof of possession, but the trial court gave less weight to this factor. We conclude that this factor was applicable.

### II. Mitigating Factors

The trial court found no relevant mitigating factors but considered the following factors, offered by the defendant and listed here by statutory number:

> (2) The defendant acted under strong provocation;
> (13) Any other factor consistent with the purposes of this chapter.

-9-

Tenn. Code Ann. § 40-35-113(2) and (13). Under the "catch-all" factor (13), the defendant argues that the trial court should have considered the facts that he turned himself in and that he is an alcoholic.

## A. Mitigating Factor (2)

The defendant contends that the victim was a bully who assaulted the defendant just prior to the murder and this should be considered a mitigating factor. In rejecting the defendant's proposed factor (2), the trial court stated the following:

> I then see if there are any mitigating factors. Counsel has proposed paragraph (2) under 40-35-113, in that the defendant acted under strong provocation as being a mitigating factor. The Court cannot help but note that whenever this occurred, Mr. Stacy had removed himself from the bar and could have easily have gone on home. If this had occurred in the bar through some act when he had alleged that the victim had smacked him or got him down and held him down, the Court might consider that, but at the point this happened, the defendant and the victim were nowhere near each other. Whatever provocation had been had been sometime before the actual killing. He was in a vehicle. He could have gone home.

We agree with the trial court and conclude that mitigating factor (2) was properly rejected.

## B. Mitigating Factor (13)

Finally, the defendant argues that two additional factors should have been considered by the trial court under the "catch-all" factor (13). The defendant argues that he could have stayed in North Carolina at his sister's house where he went shortly after the offense but that he chose instead to voluntarily turn himself in and cooperate with Tennessee authorities, thus saving the State from a burdensome extradition process. Although the record shows that the defendant did return to the scene of the crime to turn himself in, the record also shows that he was extremely uncooperative thereafter. Chief of Police Glen Stiles testified that he transported the defendant from the scene of the crime to Copper Basin Hospital to obtain a blood sample. Chief Stiles described the defendant as "uncooperative, belligerent." Detective Kevin Cole testified that he also had contact with the defendant at Copper Basin Hospital. Detective Cole described the defendant as "[v]ery mouthy, obnoxious, uncooperative." While at the hospital, the defendant was asked for a urine sample, and he refused, forcing Detective Cole to get a search warrant. According to Detective Cole:

> I took him in, sat him in a room, the lab, and I explained to him what the search warrant was, that it was a search warrant to obtain a urine specimen, and that he could either cooperate with us and voluntarily

give the sample, or that we would place a catheter in him and take the
sample.

Detective Cole noted that the defendant then voluntarily submitted to the test. We conclude that the trial court correctly denied mitigation based on the defendant's desire to be helpful to the State.

As to the fact that the defendant is an alcoholic, the trial court rightly noted that the legislature has specifically excluded the fact of voluntary consumption of intoxicants as a factor reducing the defendant's culpability for the offense. See Tenn. Code Ann. § 40-35-113(8). There is no question but that the defendant voluntarily drove through the take-out window at D.J.'s to buy beer; voluntarily consumed rum during the day; voluntarily smoked marijuana during the day; and voluntarily entered D.J.'s Bar to consume more beer. We acknowledge the testimony at the sentencing hearing regarding the abuse the defendant suffered as a small child at the hands of his father; the efforts made by the defendant to acquire a college education; and the many acts of charity done by the defendant in his community. We empathize with the trial court's frustration: "Now the problem I have, I can't sentence this bad Mark Stacy and let this good one go back home with his friends and family who love him deeply because I have to deal with both of them as one, and that's what my judgment today will have to do."

## CONCLUSION

After a review of the entire record and applicable law, we conclude that there is no merit to the defendant's issues concerning the length of his sentence. We, therefore, affirm the judgment of the trial court.

_____
ALAN E. GLENN, JUDGE

-11-