IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs July 9, 2002

### STATE OF TENNESSEE v. RICKIE REED

**Direct Appeal from the Criminal Court for Shelby County**
**Nos. 00-04751-53     James C. Beasley, Jr., Judge**

---

**No. W2001-02076-CCA-R3-CD  - Filed October 31, 2002**

---

The appellant, Rickie Reed, was convicted by a jury in the Shelby County Criminal Court of one count of second degree murder, one count of attempted second degree murder, and one count of reckless aggravated assault.  The trial court merged the reckless aggravated assault conviction into the attempted second degree murder conviction.  Following a sentencing hearing, the trial court imposed a sentence of twenty-three years incarceration in the Tennessee Department of Correction for the second degree murder conviction and a sentence of twelve years incarceration for the attempted second degree murder conviction, with the sentences to be served consecutively.  In this appeal of right, the appellant alleges that the evidence was not sufficient to support his convictions of second degree murder and attempted second degree murder.  We affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court are Affirmed.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and ALAN E. GLENN, JJ., joined.

Charles W. Gilchrist, Jr., Memphis, Tennessee, for the appellee, Rickie Reed.

Paul G. Summers, Attorney General and Reporter; Jennifer L. Bledsoe, Assistant Attorney General; William L. Gibbons, District Attorney General; and Paul F. Goodman and Mike Davis, Assistant District Attorneys General, for the appellee, State of Tennessee.

### OPINION

### I.  Factual Background

The appellant's convictions resulted from a "rolling gun battle" between two rival gangs which occurred in the residential streets of Memphis.  On the evening of  July 25, 1999, Kathy Branch had been talking with her brother and her brother-in-law while sitting on her front porch at

2195 Marble Street in Memphis. After the men left, Kathy[1] walked inside her house to smoke a cigarette. Shortly after entering the house, shooting began and Kathy realized that a lamp in her living room had been struck by a bullet. Immediately thereafter, "they were shooting at every room at my house." Kathy recalled that after the lamp was struck, the lights went out and the house became dark inside. She ran through the house, but could not get away from the gunfire. Kathy's two children were asleep in a bedroom which was also struck. After the gunfire ceased, Kathy discovered that she had been shot five times.

Sandra Branch also lived on Marble Street, just two houses down from her sister, Kathy. Sandra's four daughters and her only son, Fredrick, lived with her. On the evening of July 25, 1999, Sandra was at home when her nephew ran to her door and shouted, "My mama has been shot." Sandra immediately went to her sister's house, where she found Kathy "laying in a pool of blood."

At trial, Quentius Nesbitt testified regarding the events of July 25, 1999. According to Nesbitt, he and Byron Perry were riding around in Perry's blue Chevrolet Cavalier while smoking marijuana. Perry, who was driving, had a gun. As they were traveling down Brown Avenue from McLean, they saw a house located at the corner of Evergreen and Brown. They stopped and put the car in park. Perry fired two shots at the house. Nesbitt stated that they did not go into the house, nor did they see anyone outside.

After the shots were fired, Nesbitt and Perry got back into the car and drove to Marble Street. They then parked the car and went inside an abandoned house located next door to the house in which Fredrick Branch, known as "Baldy," lived. Antropolez Burchett, known as "Trop," and Keith Brown, known as "TT," were already inside the house. Nesbitt stayed at the house for approximately one hour and then walked home. As Nesbitt left the house, he saw Fredrick Branch sitting on the front porch.

After arriving home, Nesbitt went to sleep. "About an hour or two later," Perry, Burchett, Brown, and Fredrick Branch knocked on his door and told him that "Little Mama" had been shot. Nesbitt explained that Kathy Branch was known as "Little Mama." Nesbitt grabbed some rubber gloves for the group and they "hopped in the car." Nesbitt gave each person two gloves "so we wouldn't have nothing on us. No fingerprints or nothing."

Nesbitt noted that everyone in the car had a gun. Perry gave him a .45 caliber automatic handgun; Perry retained a sawed-off shotgun, and Fredrick Branch had a nine millimeter pistol. There was also a .38 Derringer in the car. The group drove to Kathy Branch's house on Marble Street, arriving as she was being placed in an ambulance. Soon after, the group left and drove around in the Evergreen area, near the house Perry had shot into earlier in the evening.

---

[1] Because the last name "Branch" is shared by the victim and two of the witnesses, we have elected to utilize first names for purposes of brevity. We intend no disrespect by this procedure.

As they were driving down Merchant Street in the Cavalier, Nesbitt saw a blue Lincoln backed into a driveway, with the front of the vehicle facing the street. Nesbitt then heard shots. Although he did not see the shots fired, Nesbitt assumed that the shots were fired from the Lincoln. The Lincoln immediately pulled out of the driveway and got in front of the Cavalier. A Nissan with tinted windows got behind the Cavalier and Nesbitt saw and heard shots coming from the Nissan, explaining, "You know, you can see the little fire coming from the car or whatever." Eventually, after several turns, the group drove back toward Brown Street and lost sight of the Lincoln and the Nissan. Nesbitt recalled that when they reached Brown, he heard Fredrick Branch say that he had been shot. They immediately proceeded to the home of Fredrick's aunt on Lexington Circle and parked in the driveway. Nesbitt went inside the house and asked Fredrick's aunt to call an ambulance. While Nesbitt was inside, Perry, known as "Little B," hid the guns "somewhere in they auntie's back yard." Nesbitt admitted that he pled guilty to charges resulting from the shooting at 1754 Brown and received a two-year sentence.

Antropolez Burchett testified that, on July 25, 1999, he was playing Nintendo at Christopher Watson's house on Marble Street when he heard a "shooting going on." Burchett continued playing until Watson came into the room and told him that "Little Mama" had been shot. Burchett and Watson immediately went to Kathy Branch's house. When they arrived at the house, Burchett saw "blood and bullet holes, a lot of folks around." Burchett then proceeded to Fredrick Branch's home and told him that his aunt had been shot. Fredrick began crying and said "it messed up." Shortly thereafter, Keith Brown went to Perry's house and told Perry about the shooting.

Shortly thereafter, Perry drove to Kathy Branch's house on Marble Street and announced that he knew who had shot her. Burchett, Brown, Nesbitt, and Fredrick Branch got into Perry's blue Cavalier and drove through Evergreen. Perry and Nesbitt fired shots at a house on Edward Street, near Evergreen. Burchett explained that the individuals who shot Kathy lived in the Evergreen area. As the group drove down the street, a Lincoln pulled in front of Perry's Cavalier and a white car followed behind the Cavalier. Perry shot at the Lincoln and drove up on a curb to get away. The white car continued to follow, shooting into the Cavalier. When Fredrick Branch said that he had been shot, they drove to the home of Fredrick's aunt.

Captain Phil Nason of the Memphis Police Department was working the evening shift on July 25, 1999. Following a call concerning a shooting, he was dispatched to a location on Lexington Circle. Upon arrival, he found Fredrick Branch's body in the back seat of a 1988 Chevrolet Cavalier. Underneath Fredrick's body, Captain Nason discovered two live nine millimeter bullets.

In July 1999, Lieutenant Howell Starnes was a sergeant with the Memphis Police Department assigned to the night-shift detective. On July 25, Lieutenant Starnes received a call regarding a shooting at 2195 Marble Street. Lieutenant Starnes was advised that as a result of the shooting a female victim, Kathy Branch, was transported to the hospital in critical condition. Following a visit to the hospital to obtain an update on Kathy Branch's condition, he drove to Marble Street. Shortly after he arrived at Marble Street, Lieutenant Starnes was advised of another shooting

which had occurred on Lexington Circle and was possibly related to the Marble Street shooting. He was directed to proceed to Lexington Circle, secure the scene, and determine if the shootings were related.

Upon his arrival at Lexington Circle, Lieutenant Starnes was informed that the body found in the back seat of the car was the nephew of the "lady who had been shot on Marble. So they were going to be related." Lieutenant Starnes was next dispatched to Marble Street to assist with the processing of the scene and to take photographs. After completing his duties at Marble Street, Lieutenant Starnes went to an area around the 1100 Block of North McLean, near Edward. There, he found four "spent rounds, assault-rifle rounds on the ground there."

Lieutenant Starnes further described the scene inside Kathy Branch's home following the shooting. Due to the extent of the damage to the house, he concluded that the bullets were probably from a high-powered weapon. Significantly, he noted that the bullets passed through the hard metal part of the iron front door. He related that the house "was riddled with bullet holes." Lieutenant Starnes concluded that the damage could have been caused by an SKS or an AK-47 rifle; however, he did not believe the damage could have been caused by a nine millimeter pistol or a .45 caliber handgun.

Lieutenant Gerry Blum of the Memphis Police Department was assigned the responsibility of preparing and presenting to the Shelby County District Attorney's office the case involving the death of Fredrick Branch. As the "signed case officer," Blum spoke with the appellant on July 27, 1999, about the appellant's involvement in the shootings. The appellant, also known as "Poo," had an eleventh grade education and was literate. The appellant was given an advice of rights form which the appellant read and signed. The appellant then made and signed a statement in which he admitted his involvement in the shootings. According to the appellant:

> It was about 10 p.m., on 7/25/99, D[i]on who goes by the name of "Pretty[,"][2] came by my house on Coppock and he had told me Black's house on Brown Street, got shot up. Then, he told me to come go with them. We went over to Black's house. When we got to Black's house it was[] me, D[i]on, Black, Lil' Ugly, Levi and Black's girlfriend was there. There was already guns there. I had got the SK, D[i]on, got a black .9mm, and Black, had a black .9mm. Me, D[i]on and Black, got into Black's girlfriend's silver Nissan. Lil' Ugly, Levi and Pokey got into Pokey's white Kia. They followed us to Marble Street. D[i]on told us, "This is the house, here." Then, we began to shoot at the house. I shot the SKS, D[i]on shot the .9mm, Levi shot a .9mm. I don't know who was shooting in the other car. We were leaving and then we had a wreck with a blue Lincoln that Lil' Ugly was driving. He ran into us and then, we left and went back

---

[2] Throughout the record, this name is alternately spelled "Deon" or "Dion." Because the individual's name was spelled "Dion" in the indictment, we have chosen to utilize this spelling.

to Black's house. We parked our car on the other side of Evergreen and walked around to D[i]on's house. We left all the guns in the field across from D[i]on's house. We sat out there for a while. About thirty minutes after we shot up the house, we heard some shots coming like from around Black's house. Me, D[i]on, and Levi was getting in the silver Nissan to go to Black's house. Black and Lil' Ugly jumped in the Lincoln. As we were pulling off, a blue Chevy with tinted windows rode pass me, D[i]on and went to the blue Lincoln and started shooting in it. Levi ran and got the SK. He gave it to me and we went down Evergreen. We see the blue Chevy shootin' at the blue Lincoln, so we made a left down Edwards. When we get to McLean, the blue Chevy was coming down and started shooting at us. I started shooting the SK and Levi was shooting the .9mm. The car got away and we turned around and went back to Black's house. Black got all the guns and said he was going to get rid of all the guns. We left and went back to D[i]on's house.

Additionally, in his statement the appellant estimated that he fired approximately ten shots at the blue Cavalier. He alleged that he did not know the occupants of the house on Marble Street or the occupants of the blue Cavalier. However, he did admit that he was a member of the gang known as the "Gangster Disciples" and the occupants of the Cavalier were members of the "Vice Lords."

Dr. O'Brian Cleary Smith, the Shelby County Medical Examiner, testified regarding the autopsy performed on Fredrick Branch. Dr. Smith related that the victim died from a gunshot wound to the back. The left side of the victim's back received a series of injuries from the passage of a bullet and there was also an injury to the elbow. Dr. Smith concluded that "it's possible for one bullet to have produced all four wounds."

At trial, the appellant testified that on July 25, 1999, Dion Vance and "Black" picked up the appellant and the group drove to Black's house. Dion Vance and Black told the appellant that a house on Marble Street "got shot up." The appellant believed that Black was involved in the incidents because "some guys came over to the house, supposed to have robbed him for some money and some rims and some guns." However, the robbery was foiled when a neighbor drove by the scene. The individuals became frightened, abandoned the planned robbery and "so they shot up the house." The appellant was unable to identify the individuals. The appellant stated that he did not know the occupants of the house at Marble Street, and he had never met the victim, Kathy Branch. He was not attempting to kill Kathy Branch but thought that he was shooting at a drug house. The appellant admitted that he shot "four round[s]" into the house on Marble Street. The appellant had an SKS rifle and Dion Vance and Black each had nine millimeter pistols.

After leaving Marble Street, the group returned to Dion Vance's house and put the guns in a field across the street. Shortly thereafter, at approximately 1:30 a.m., they heard gunshots

coming from the area of Black's house, which was located nearby on Brown Avenue. Lil' Ugly, Black, Boonky, and Clyde ran to the blue Lincoln and the appellant, Dion Vance and Levi got into the Nissan, intending to drive to Brown Avenue. A blue Cavalier came by, got behind the Lincoln, and fired shots, striking the Lincoln five times. According to the appellant, "Levi went got the SK. We got in the car. He passed it to me. D[i]on still had his gun."

After this encounter, Dion Vance decided to "check on [his] cousin." The group in the Nissan drove to Edwards Avenue where they encountered the Cavalier. The individuals in the Cavalier fired shots at the Nissan. The appellant explained, "D[i]on let off some rounds. He hit the sidewalk so he quit shooting to straighten the car up. . . . So by the time he yanked the car around, the Cavalier, it was a stretch on down so I let off some rounds." The appellant was uncertain of the number of shots he fired. He estimated that the vehicles were approximately fifty yards apart when he fired the shots, but only ten to twenty yards apart when Dion Vance fired at the Cavalier. The appellant did not know if any shots struck the Cavalier. After the shooting, the group returned to Black's house. Black took the guns and stated that he would "take care" of them.

The appellant contended that he fired shots at the Cavalier because he was afraid. He stated that when he was younger, he had been "carjacked" and was shot three times. The appellant alleged that the shooting on Marble Street was intended to put drug dealers out of business and also to get revenge for the shooting at Black's house. The appellant admitted that he was a member of the Gangster's Disciples and further explained that Black was the Chief of Security for the gang.

## II. Analysis

On appeal, the appellant alleges that the evidence is not sufficient to sustain his convictions of second degree murder and attempted second degree murder. Specifically, regarding his conviction for second degree murder, the appellant contends that the evidence does not show beyond a reasonable doubt whether the appellant or someone else fired the fatal bullet that struck Fredrick Branch. Moreover, the appellant contends that the evidence fails to show that he acted "knowingly." As to his conviction for attempted second degree murder, the appellant argues that "[t]he proof presented at trial showed that [the appellant] did act in a reckless manner by firing multiple shots into the house[;] however, the proof was insufficient to sustain a verdict of guilty for Criminal Attempt: Second Degree Murder."

When an accused challenges the sufficiency of the evidence, the standard is whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979). In its review of the evidence, an appellate court must afford the State "the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences that may be drawn therefrom." State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). Questions concerning the credibility of the witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact, not this court. State v. Morris, 24 S.W.3d 788, 795 (Tenn. 2000).

-6-

Second degree murder is the "knowing killing of another." Tenn. Code Ann. § 39-13-210(a)(1) (1997). A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result. Tenn. Code Ann. § 39-11-302(b) (1997). Therefore, to support a second degree murder conviction, the State had only to establish that the killing of Fredrick Branch was knowing beyond a reasonable doubt. State v. Summerall, 926 S.W.2d 272, 275 (Tenn. Crim. App. 1995). The evidence at trial established that the appellant and Dion Vance were in pursuit of a Chevrolet Cavalier in which Fredrick Branch was a passenger. The appellant admitted that he repeatedly fired into the Cavalier, using a high-powered assault-type weapon. The appellant estimated that he fired approximately ten shots at the Cavalier. He admitted that the shooting took place in a residential neighborhood and that he was trying to hit the Cavalier when he fired the shots. At least one bullet struck and killed Fredrick Branch. Whether the bullet which killed Fredrick Branch came from the appellant's gun or Dion Vance's gun is irrelevant. The State's theory was that the appellant and Dion Vance were both criminally responsible for the conduct of the other. Tennessee Code Annotated section 39-11-402(2) (1997) provides:

> A person is criminally responsible for an offense committed by the conduct of another if[,] . . . [a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense.

Furthermore, "[a] person can act knowingly irrespective of his or her desire that the conduct or result will occur." State v. Gray, 960 S.W.2d 598, 604 (Tenn. Crim. App. 1997); State v. Rutherford, 876 S.W.2d 118, 120 (Tenn. Crim. App. 1993). The proof adduced at trial revealed that the appellant deliberately shot into a moving vehicle with a high powered assault weapon, clearly aware that his actions could result in the death of an individual. Based upon the evidence presented, the jury could have found the essential elements of second degree murder beyond a reasonable doubt.

In examining the appellant's conviction for attempted second degree murder, we note that criminal attempt occurs when a person acting with the kind of culpability otherwise required for the offense:

> (1) Intentionally engages in action or causes a result that would constitute an offense if the circumstances surrounding the conduct were as the person believes them to be;
>
> (2) Acts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part; or
>
> (3) Acts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense.

Tenn. Code Ann. § 39-12-101(a)(1)-(3) (1997).

We conclude that the State presented ample evidence from which a rational juror could have concluded that the appellant *knowingly* attempted to kill Kathy Branch. Construing the evidence in the light most favorable to the State, the record reveals that the appellant admitted that he shot into Kathy Branch's house, using an assault-type weapon. The appellant contended, "We thought they were selling drugs at the house and that's why we went over there to shoot up the house." Kathy Branch testified that the lights were on in the house when the shooting began. Describing the shooting, she recalled, "they were shooting at every room at my house." She was struck by five bullets, receiving injuries to the breast, stomach, hand, and leg. Photographs introduced at trial showed damage to every room in the house, including the bedroom where her children were sleeping. Again, the evidence is sufficient for a rational jury to conclude that the appellant knowingly attempted to kill Kathy Branch. This issue is without merit.

### III.  Conclusion

In summary, the evidence is sufficient to support the appellant's convictions for second degree murder and attempted second degree murder. Accordingly, the judgments of the trial court are affirmed.

_____
NORMA McGEE OGLE, JUDGE