IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs September 21, 2005

## STATE OF TENNESSEE v. LONNIE LEE OWENS

**Appeal from the Circuit Court for Franklin County**
**No. 15356    Buddy D. Perry, Judge**

---

**No. M2005-00362-CCA-R3-CD - Filed October 18, 2005**

---

The Defendant, Lonnie Lee Owens, was convicted by a jury of second degree murder, abuse of a corpse, and theft over $10,000. The trial court sentenced the Defendant as a Range I, standard offender to twenty-five years for the murder, one year for the abuse of a corpse, and four years for the theft. The trial court ordered these sentences to be served consecutively in the Department of Correction for an effective term of thirty years. In this direct appeal, the Defendant challenges the length of his sentence for the murder and also challenges the trial court's order that his sentences be served consecutively. We reduce the Defendant's sentence for the second degree murder conviction to twenty-four years. We further reverse the trial court's imposition of consecutive sentences.

### Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Reversed in Part; Sentence Modified

DAVID H. WELLES, J., delivered the opinion of the court, in which NORMA MCGEE OGLE and J.C. MCLIN, JJ., joined.

Robert T. Carter and Roger J. Bean, Tullahoma, Tennessee, for the appellant, Lonnie Lee Owens.

Paul G. Summers, Attorney General and Reporter; Brian C. Johnson, Assistant Attorney General; J. Michael Taylor, District Attorney General; and Steve Blount, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

The record before this Court does not contain a transcript of the Defendant's trial, but does contain a transcript of the Defendant's sentencing hearing, including a copy of the Defendant's presentence report, which was made an exhibit to the hearing. From the materials before us, we have gleaned that the Defendant killed his estranged wife, Heather Owens, in May 2003 when she came to his house to pick up their two young children. The Defendant struck the victim and then bound her with duct tape. The Defendant wrapped duct tape over the victim's mouth and nose, such that she suffocated to death. The couple's children were in the house at the time of the homicide. The

Defendant subsequently buried the victim's body and disposed of her pick-up truck. The Defendant's girlfriend assisted in the disposal of the victim's truck.

At the sentencing hearing, the victim's mother and brother testified about the effects of the murder on them, their family and the children. Judy Bolin, the victim's mother, testified that the Defendant "can . . . be a good person at times, but just in a snap he's off like a rock. He'll tell you off in a minute, and he'll do whatever he can to you to hurt you." Ms. Bolin also stated that the Defendant "controlled everything [the victim] did," including how she spent money and where she spent her time. Ms. Bolin explained that the Defendant murdered her daughter on Ms. Bolin's birthday, and that he knew he was doing so.

Doug Smith testified on behalf of the Defendant, explaining that the Defendant was an employee of his for seven or eight months. Mr. Smith described the Defendant as a "good employee." Barry Rhoads also testified on behalf of the Defendant. Mr. Rhoads explained that he is a minister as well as the owner of an engineering consulting firm. Mr. Rhoads met the Defendant and the victim in 1998 because they were attending the church at which he was serving as co-pastor. The Defendant was actively involved in the church, becoming a deacon and involving himself "heavily" with the youth. Sometime in 2000, the victim spoke to him about the marital troubles she and the Defendant were experiencing. From that point until late 2001 or early 2002, Mr. Rhoads' contact with the Defendant and his wife became infrequent. Later, he saw the Defendant more frequently as he tried to help the Defendant "work his way through separation and then the divorce."

Mr. Rhoads testified that he never knew the Defendant to be mean, aggressive, controlling or dishonest. After the victim disappeared, however, he began to suspect that the Defendant might be somehow involved. Eventually, the Defendant confessed to him that he had killed his estranged wife. In Mr. Rhoads' opinion, the Defendant had repented of his actions and "his confession and his asking for forgiveness was as genuine as anybody else's." Mr. Rhoads continued to minister to the Defendant after his confinement and continued to consider the Defendant a friend.

On cross-examination, Mr. Rhoads acknowledged that the Defendant did not confess his crime until after he realized the police were coming to arrest him.

The Defendant testified on his own behalf. He stated that he met his wife, the victim, in 1996 when he was twenty-seven and she was nineteen. They married in July 1997 and had two children. During the marriage he worked repairing heavy-duty equipment. They separated in September 2002. He killed the victim nine or ten months later. The Defendant stated that, prior to the victim's death, he never struck her or threw anything at her.

During the separation, the Defendant began keeping a detailed diary including notations on the victim's whereabouts. The Defendant stated that he kept this diary because he was afraid of accusations the victim was making. The beginning of the divorce proceedings were "very hot," he said, but settled down after some time passed. However, the Defendant began dating Kara Matthews

in May 2003. After he began seeing Ms. Matthews, he stated, he "started receiving threats. There was vandalism to [his] house and property."

The Defendant maintained that he had not planned to kill the victim. He stated that he "just wish[ed] it never happened" and that, as a result, he felt "like [his] whole inside has been ripped out." He testified, "I don't know how to describe the emptiness and the tore apart feelings that I have or how I could ever repay. No way I would want to them [sic] to suffer anything. I'm -- I'm sorry from the bottom of my heart. I just don't know how to describe it."

On cross-examination, the Defendant acknowledged that, a day or two after burying the victim, he lied to the victim's mother about her whereabouts. The Defendant maintained that his own family never inquired about where she was or what had happened to her after her disappearance. According to the Defendant, their children made no inquiries for the two weeks before their mother's body was found.

The Defendant also admitted that, within an hour of killing the victim, he called her cellphone and left a message on it. He also admitted to leaving child support checks for her after her death. He claimed, however, that he took these actions not to deceive the police but because he "didn't know what to do." He admitted to having gotten rid of the victim's vehicle after killing her. He admitted to getting rid of her body after killing her. He admitted to having involved Ms. Matthews in disposing of the victim's truck.

After hearing the above testimony, the trial court issued its ruling from the bench. The trial court noted that the Defendant was being sentenced as a Range I, standard offender and that the presumptive sentence for the Defendant's second degree murder conviction was twenty years. As a mitigating factor, the trial court found that the Defendant had no prior criminal history. The trial court then applied two enhancement factors: (1) the Defendant treated the victim with exceptional cruelty in the commission of the offense, and (2) the personal injuries inflicted on the victim during the commission of the offense were particularly great. Weighing the single mitigating factor against the two enhancement factors, the trial court found that the maximum sentence of twenty-five years was the appropriate sentence for the second degree murder conviction.

The trial court found no enhancement factors applicable to the abuse of a corpse offense and imposed the minimum sentence of one year for that conviction.

With respect to the theft offense, the trial court applied as a single enhancement factor that the Defendant was the leader in the commission of that crime. Accordingly, the trial court imposed a sentence of four years for that offense, out of a possible range of three to six years.

The trial court then determined that the sentences should all run consecutively to one another on the basis that the Defendant is a "dangerous offender."

The Defendant now appeals the trial court's ruling on his sentences.  Specifically, the Defendant contends that the trial court erred in applying the two enhancement factors to his murder conviction; did not apply sufficient weight to mitigating factors; and erroneously ordered his sentences to be served consecutively.  The State concedes that the trial court erred in applying one of the enhancement factors to the murder conviction but argues that the overall effective sentence of thirty years should be affirmed.

## STANDARD OF REVIEW

Before a trial court imposes a sentence upon a convicted criminal defendant, it must consider (a) the evidence adduced at the trial and the sentencing hearing; (b) the presentence report; (c) the principles of sentencing and arguments as to sentencing alternatives; (d) the nature and characteristics of the criminal conduct involved; (e) evidence and information offered by the parties on the enhancement and mitigating factors set forth in Tennessee Code Annotated sections 40-35-113 and 40-35-114; and (f) any statement the defendant wishes to make in the defendant's own behalf about sentencing.  See Tenn. Code Ann. § 40-35-210(b); State v. Imfeld, 70 S.W.3d 698, 704 (Tenn. 2002).  To facilitate appellate review, the trial court is required to place on the record its reasons for imposing the specific sentence, including the identification of the mitigating and enhancement factors found, the specific facts supporting each enhancement factor found, and the method by which the mitigating and enhancement factors have been evaluated and balanced in determining the sentence.  See State v. Samuels, 44 S.W.3d 489, 492 (Tenn. 2001).

Upon a challenge to the sentence imposed, this court has a duty to conduct a de novo review of the sentence with a presumption that the determinations made by the trial court are correct.  See Tenn. Code Ann. § 40-35-401(d).  However, this presumption "is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances."  State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991).  If our review reflects that the trial court followed the statutory sentencing procedure, that the court imposed a lawful sentence after having given due consideration and proper weight to the factors and principles set out under the sentencing law, and that the trial court's findings of fact are adequately supported by the record, then the presumption is applicable, and we may not modify the sentence even if we would have preferred a different result.  See State v. Fletcher, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991).  We will uphold the sentence imposed by the trial court if (1) the sentence complies with the purposes and principles of the 1989 Sentencing Act, and (2) the trial court's findings are adequately supported by the record.  See State v. Arnett, 49 S.W.3d 250, 257 (Tenn. 2001).  The burden of showing that a sentence is improper is upon the appealing party.  See Tenn. Code Ann. § 40-35-401 Sentencing Commission Comments; Arnett, 49 S.W.3d at 257.

## LENGTH OF INDIVIDUAL SENTENCES

The Defendant does not challenge the minimum sentence imposed for his abuse of a corpse conviction.  Accordingly, we need not address that sentence.  As to his other two sentences, the Defendant identifies as issue number two in his initial appellate brief that the trial court "erred in sentencing the Defendant to the maximum sentence in the range for second degree murder and theft of property."  In fact, the trial court did not sentence the Defendant to the maximum for his theft

offense.  The Defendant's theft conviction is a Class C felony.  See Tenn. Code Ann. § 39-14-105(4).  As a Range I, standard offender, the Defendant faced a sentencing range of three to six years for that offense.  See id. § 40-35-112(a)(3).  The presumptive Range I sentence for a Class C felony is three years.  See id. § 40-35-210(c).  The trial court increased the Defendant's presumptive sentence for that crime by only one year, based on the enhancement factor for being a leader in the commission of the offense.  See id. § 40-35-114(3).  The Defendant tacitly admitted during the sentencing hearing that Ms. Matthews took direction from him in conjunction with their joint effort to dispose of the victim's truck.  The Defendant offers no argument in either his initial appellate brief or his reply brief that the trial court erred in applying this enhancement factor.  Accordingly, this issue is waived.  See Tenn. Ct. Crim. App. R. 10(b).  Furthermore, we see no error by the trial court in its application of this enhancement factor to the theft offense.  Therefore, the Defendant has failed to establish that he is entitled to any reduction in his sentence for the theft offense.

We turn now to the Defendant's sentence for his murder of the victim.  Second degree murder is a Class A felony.  See Tenn. Code Ann. § 39-13-210(b).  The Defendant is a Range I, standard offender.  The Range I sentencing range for a Class A felony is fifteen to twenty-five years.  See id. § 40-35-112(a)(1).  The presumptive sentence for a Class A felony is midpoint in the range, see id. § 40-35-210(c), or twenty years in this instance.  "Should there be enhancement and mitigating factors for a Class A felony, the court must start at the midpoint of the range, enhance the sentence within the range as appropriate for the enhancement factors, and then reduce the sentence within the range as appropriate for the mitigating factors."  Id. § 40-35-210(e).

The trial court enhanced the Defendant's sentence for his second degree murder conviction on the basis that the Defendant "treated . . . a victim . . . with exceptional cruelty during the commission of the offense" and that "[t]he personal injuries inflicted upon . . . the victim w[ere] particularly great."  Id. § 40-35-114(6), (7).  The State concedes in its appellate brief that the trial court erred in applying factor (7) because the personal injuries inflicted in every homicide are "particularly great" and this factor is therefore an essential element of the offense such that it may not be applied to enhance the Defendant's sentence.  See id. § 40-35-114; State v. Williamson, 919 S.W.2d 69, 82 (Tenn. Crim. App. 1995).  Accordingly, the trial court should not have enhanced the Defendant's sentence for the second degree murder on this basis.

We find no error, however, in the trial court's application of enhancement factor (6).  Although we do not have any medical testimony about the victim's death in the record before us, the trial court did make a finding for the record during the sentencing hearing that "this was a death by strangulation where the lady was duct taped."  The Defendant admitted that he assaulted the victim in his house while their children were close by.  The presentence report admitted into evidence at the sentencing hearing without objection sets forth in part that the Defendant

> used duct tape to tape the victim's legs together and her hands behind her back.  He then taped her face from the chin to just under her eyes covering her mouth and nose. . . . Dr. Charles Harlan noted in the autopsy report that . . . [h]e . . . found traces of duct tape in the victim's lung.  Dr. Harlan concluded that the victim's death was

caused by suffocation as a result of having her mouth and nose covered with duct tape.

The Defendant does not contest these facts but contends that the method by which he killed the victim did not involve abuse or torture and that this enhancement factor is therefore inapplicable.

The use of exceptional cruelty in the killing of the victim is not an element of second degree murder and may therefore, where appropriate, be considered as an enhancement factor. See State v. Gray, 960 S.W.2d 598, 611 (Tenn. Crim. App. 1997). The proper application of this factor in a murder case requires evidence that denotes the infliction of pain or suffering for its own sake or from the gratification derived therefrom, and not merely the pain or suffering inflicted as the means of accomplishing the murder. See Arnett, 49 S.W.3d at 258. Our supreme court has recognized that this enhancement factor may be applicable where there is proof of extensive psychological abuse or torture. See id. at 259. For example, the application of this enhancement factor to an especially aggravated robbery conviction has been upheld where the defendant executed two persons by gunshots after having forced them onto the floor of a walk-in cooler. See State v. Reid, 91 S.W.3d 247, app. 311 (Tenn. 2002) (finding that the defendant committed the especially aggravated robbery with exceptional cruelty because "[t]he anguish experienced by the victims at this point [in the cooler] while they awaited their execution is unfathomable"). In upholding the application of this enhancement factor in the Reid case, this Court also noted the defendant's "calculated indifference toward suffering." Id.

We think the facts support the application of this enhancement factor to the means by which the Defendant killed his estranged wife. The record before us indicates that the Defendant bound the victim's hands and feet and then covered her mouth and nose with duct tape. The Defendant committed these actions while the victim was in his house and while her children were mere feet away.[1] The autopsy of the victim revealed traces of duct tape in one of the victim's lungs: indicating how desperately she tried to continue breathing. After the victim was dead, the Defendant took her body to an island in Tims Ford Lake and buried it in a shallow grave. He then returned to his house and had sex with his girlfriend.[2] These facts indicate that this Defendant treated the victim with a calculated indifference to her suffering and that he achieved some form of gratification from murdering his wife. These facts also establish that the victim tried desperately to continue breathing but eventually suffocated to death. We have no trouble concluding that the victim's suffering while she struggled to live was "unfathomable" and was the direct result of the method used by the Defendant to accomplish the killing. As noted by Judge Scott, "If strangulation, with the victim vigorously fighting for another breath, is not exceptional cruelty, I don't know what is." State v. Bobby Lee Knight, No. 87-234-III, 1989 WL 24436, at *4 (Tenn. Crim. App., at Nashville, Mar. 21,

[1] The Defendant testified during the sentencing hearing that the children were 30 to 40 feet away when he killed the victim.

[2] The presentence report includes these circumstances of the offense in the section titled "Official Version."

-6-

1989) (Scott, J., dissenting). The Defendant's assertion that the trial court erred in applying this enhancement factor to his conviction for second degree murder is without merit.

The Defendant also argues that the trial court erred in applying enhancement factors to his sentence on the basis of the United States Supreme Court's decision in Blakely v. Washington, 124 S.Ct. 2531 (2004). The Blakely decision holds that the Sixth Amendment to the federal Constitution permits a defendant's sentence to be increased only if the enhancement factors relied upon by the judge are based on facts reflected in the jury verdict or admitted by the defendant. See id., 124 S.Ct. at 2537. The only basis upon which enhancement is otherwise permitted is the defendant's previous criminal history: where the defendant has prior convictions, the trial court may enhance the defendant's sentence without an admission or jury finding. See Apprendi v. New Jersey, 530 U.S. 466, 490 (2000); Blakely at 2536. Subsequent to the Defendant's appeal of this case, the Tennessee Supreme Court considered the impact of Blakely on Tennessee's sentencing scheme and concluded that the Criminal Sentencing Reform Act of 1989, pursuant to which the Defendant was sentenced, does not violate a defendant's Sixth Amendment rights. See State v. Gomez, 163 S.W.3d 632, 661 (Tenn. 2005). Accordingly, the Defendant's argument on this basis has no merit.

The Defendant also complains that the trial court did not recognize and/or accord sufficient weight to several mitigating factors.[3] The Defendant asserts in his initial appellate brief that, in addition to having no criminal record, he "had a great amount of family support, had a good, honest and steady work record, and was a church and community leader."[4] He further states that "had these factors been properly considered, the sentence calculation would have been . . . at the lower end of the range."

In imposing the twenty-five year term for the Defendant's second degree murder offense, the trial court recognized the Defendant's lack of a criminal history as a mitigating factor but determined that it entitled the Defendant to no downward movement "at all" in the sentencing range. As this Court has previously recognized, "[p]rovided the trial court complies with the purposes and principles of the Criminal Sentencing Reform Act of 1989 and its findings are adequately supported by the record, the weight afforded to enhancement and mitigating factors is left to the trial court's discretion." State v. Souder, 105 S.W.3d 602, 606 (Tenn. Crim. App. 2002). We find no abuse of discretion by the trial court in refusing to reduce the Defendant's sentence on this basis. Nor do we find any abuse of discretion by the trial court in failing to recognize or weigh the additional mitigating factors urged by the Defendant. The Defendant murdered his wife. He did so by a

---

[3]The State argues in its appellate brief that the Defendant has waived this issue because his lawyer specifically mentioned only the lack of the Defendant's criminal record as a mitigating factor during closing remarks at the sentencing hearing. However, defense counsel had filed a comprehensive listing of mitigating factors for the trial court's consideration prior to the hearing. Moreover, proof of the Defendant's work history and church activities was adduced at the hearing. We will, accordingly, address this issue on the merits.

[4]These circumstances are not specifically codified as mitigating factors in our Criminal Sentencing Reform Act of 1989, but may be considered as such if the trial court determines them to be appropriate for the offense and "consistent with the purposes of" the Act. See Tenn. Code Ann. § 40-35-113(13).

process that was most certainly agonizing to the victim. He did so while his children were in the house with him and the victim. The Defendant's past good deeds and alleged family support[5] simply do not entitle him to a sentencing benefit under the facts and circumstances of this case. This issue is without merit.

Given our determination that the trial court properly applied only one enhancement factor to the Defendant's sentence for his second degree murder conviction, we must modify the Defendant's sentence for that crime to twenty-four years.

## CONSECUTIVE SENTENCES

We turn now to the Defendant's contentions regarding the trial court's order that he serve his sentences consecutively. A trial court may order a convicted defendant to serve his or her sentences consecutively upon finding by a preponderance of the evidence that the defendant "is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high." Tenn. Code Ann. § 40-35-115(b)(4). However, before imposing consecutive sentences upon this basis, the trial court must further find that "the terms imposed are reasonably related to the severity of the offenses committed and are necessary in order to protect the public from further criminal acts by the offender." State v. Wilkerson, 905 S.W.2d 933, 938 (Tenn. 1995).

In this case, the trial court found that, based upon the Defendant's murder of the victim, he is a dangerous offender. The trial court further found that the effective term of thirty years was reasonably related to the severity of the Defendant's crimes. As to the requirement that consecutive service is necessary to protect the public from further offenses by the Defendant, the trial court told the Defendant that "notwithstanding your testimony about remorse and your apology to this Court I was convinced from your testimony that everything you said was self serving and done to protect you and that you'll continue to protect your own interest." This finding by the trial court was consistent with its earlier general finding that the Defendant's testimony during his sentencing hearing was not credible but, rather, "totally self serving." Accordingly, the trial court determined that the public needed protection from the Defendant, apparently on the basis that the Defendant's willingness to testify in a self serving as opposed to a truthful manner indicated that the Defendant would also be willing to engage in further criminal acts if necessary to protect himself in some regard.

We are constrained to respectfully disagree with the trial court on this point. The Defendant has no previous history of serious criminal offenses. The instant crimes were committed against the Defendant's estranged wife during the pendency of divorce proceedings. According to the Defendant's testimony, these proceedings had been heated and hostile, at least sporadically. The Defendant had begun dating someone prior to the divorce becoming final. The Defendant committed the murder shortly after his new romantic relationship began and after the victim was allegedly

---

[5]The record contains no testimonials by the Defendant's family members as to the level of support they are allegedly willing to provide him.

threatening him. These circumstances point not to an existing or future pattern of criminal behavior during which the general public is put at risk, but rather to an isolated event occurring in the midst of domestic difficulties. We do not imply that this violent murder is not deserving of harsh punishment. However, a single episode of criminal violence directed at a family member during a time of strife does not indicate, in and of itself, a propensity to commit future violent acts so as to establish that the public needs protection from "further criminal acts" by the offender. In short, we conclude that the proof in this case is not sufficient to establish that consecutive sentences are necessary to protect the public from further criminal conduct by the Defendant, as required by the Wilkerson decision. See 905 S.W.2d at 938. Accordingly, we have no choice but to overturn the trial court's imposition of consecutive sentences on the basis that the Defendant is a "dangerous offender."

## CONCLUSION

The trial court erred when it enhanced the Defendant's sentence for the second degree murder conviction on the basis that the murder involved particularly great personal injuries. We have therefore reduced the Defendant's sentence for this conviction from twenty-five years to twenty-four years. We have further determined that the trial court erred when it ordered the Defendant's sentences to be served consecutively. Accordingly, we reverse that portion of the trial court's judgments and remand this matter such that the judgments against the Defendant may be corrected to reflect the modification of his second degree murder sentence and that his sentences are to be served concurrently. In all other respects, we affirm the judgments of the trial court.

_____
DAVID H. WELLES, JUDGE