IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs December 2, 2003

**STATE OF TENNESSEE v. DERRY LAVELLE LOVINS**

**Direct Appeal from the Circuit Court for Dyer County**
**No. C02-40   Lee Moore, Judge**

---

**No. W2003-00309-CCA-R3-CD  - Filed February 4, 2004**

---

A Dyer County jury found the Defendant, Derry Lavelle Lovins, guilty of second degree murder, and the trial court sentenced the Defendant to twenty-three years in prison. The Defendant now appeals, contending that the evidence presented at trial is insufficient to support his conviction. Finding that sufficient evidence exists, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and ALAN E. GLENN, JJ., joined.

Charles M. Agee, Jr., Dyersburg, Tennessee, for the appellant, Derry Lavelle Lovins.

Paul G. Summers, Attorney General and Reporter; Michael Moore, Solicitor General; J. Ross Dyer, Assistant Attorney General; and C. Phillip Bivens, District Attorney General, for the appellee, State of Tennessee.

**OPINION**
**I. Facts**

A Dyer County Grand Jury indicted the Defendant, Derry Lavelle Lovins, on the charge of premeditated first degree murder. A jury found the Defendant guilty of second degree murder, and the trial court sentenced him to twenty-three years in prison. The Defendant appeals contending that the evidence presented at trial is insufficient to support his conviction.

The following evidence was presented at the Defendant's trial: Ashunn Harris testified that he knew the Defendant for about three or four years and knew the victim, Geoffrey Burnett, for about one year at the date of the killing, December 4, 2001. Harris testified that he was outside of his home, which was in close proximity to the murder scene, and noticed that the Defendant drove by his house in a green minivan four or five times during the day. Harris stated that both he and the victim were outside Harris house together when the Defendant drove by in his minivan. Harris

testified that he and the victim left Harris house at 6:00 or 6:30 p.m. and that, when they left, it was dark outside. Harris stated that he and the victim left Harris house in the victim's car and that the victim was driving while Harris sat in the front passenger's seat. Harris testified that he and the victim picked up James "Splat" Barr, who got in the victim's vehicle and sat behind Harris. Harris stated that he did not see a gun in the vehicle.

Harris said that the three men were headed back to Harris house when they noticed the green minivan the Defendant was driving earlier. Harris stated that both cars stopped at a stop sign and rolled down the windows, and the victim and the Defendant "exchanged words." Harris stated that the Defendant asked the victim for "some change" and the victim said that "he didn't have [any] change for him . . . ." Harris testified that the two kept repeating these words with raised voices and the Defendant again asked the victim for "change" and the victim said, "The only way you're go[ing to] get the change is [if] you put a bullet in my head." Harris testified that, after the victim made this statement, he heard the Defendant's door open and then heard one shot, after which Harris "got down," and then he heard another shot. Harris stated that right after the shots were fired he heard the minivan pull away "real fast."

Harris stated that when he raised his head back up he noticed that the victim was "laid out" and bleeding. Harris opened his door, the window of which was "busted out," and ran and called an ambulance. Harris stated that he did not see a gun in the victim's possession at any time.

On cross-examination, Harris stated that, immediately prior to the shooting, the victim "was about to open the door. He had cracked it open a little bit." Harris testified that he did not see the Defendant make any gesture towards the victim prior to the victim opening his car door. Harris also agreed that it was common knowledge in the community that the victim had acted violently towards other people in the past. Harris stated that he heard about an incident in November 2001 when the victim went into an apartment and shot someone.

Billy Buck, an officer with the Dyersburg Police Department, testified that he was on patrol on December 4, 2001, and was the first officer to arrive on the scene of this shooting. The officer stated that, when he got to the scene, several people were surrounding the vehicle and the passenger window of the car was "shot out." The officer stated that blood covered the victim's face and it was apparent that he suffered a "serious wound." The officer stated that the passenger's side door was open and the driver's side door was shut. The officer stated that he checked the victim's car for weapons and did not find a gun, but he did find a cell phone in the victim's hand. The officer said that there were no passengers in the victim's car when he arrived. Officer Buck stated that the Defendant called the police department shortly after the shooting and reported that someone was chasing him in a vehicle. The officer noted that the description given by the Defendant matched the victim's vehicle, which was parked at the scene of the shooting.

On cross-examination, the officer admitted that he did not see any passengers in the vehicle when he got to the crime scene and that it was possible that either passenger could have removed items from inside the car, including a weapon, when they left.

Jim Gray, an investigating officer with the Dyersburg Police Department, testified that on December 4, 2001, he received a call to investigate a shooting. The officer stated that, when he arrived at the scene, he saw a maroon Pontiac with the victim inside. Officer Gray stated that there was a bullet hole in the center of the driver's side door, which was closed. The officer stated that the driver's side window was rolled down and the passenger's side door was open and the glass in the window was broken. The officer testified that he did not see any weapon in the victim's car but that he did see a cell phone lying in the victim's lap.

Officer Gray testified that he heard from the dispatcher that the Defendant advised the police that he had been in an altercation and shooting. The officer testified that he found the van that the Defendant was driving during the shooting and, after searching it, found three .357 live rounds and one glove. The officer testified that his investigation revealed that there were four men in the minivan with the Defendant at the time of the shooting: Josh Garrett, Dennis Akins, Billy Thompson, Jr., and Anthony Gooch.[1] The officer testified that he also determined that there were two men in the car with the victim at the time of the shooting: James Barr and Ashunn Harris. On cross-examination, Officer Gray testified that the bullet hole in the door was about three or four feet below the victim's head.

Cynthia Gardner, an employee with the medical examiner's office, testified that she examined the victim's body and swabbed the victim's hands for gunshot residue. Gardner testified that the victim's gunshot wound was located just above his left ear. Gardner stated that, from the entrance wound, she determined that the gun was more than two feet away from the victim at the time that it was fired. Gardner determined that when the victim was shot he was looking straight ahead, and the bullet came from a perpendicular direction, entering the side of the victim's head.

Laura Hodge, a special agent forensic scientist for the Tennessee Bureau of Investigation, testified that the gunshot residue test performed on the victim was negative, indicating that there was no gunshot residue on the victim's hands.

John David Fisher, a bail bondsman, testified that he was familiar with the Defendant. Fisher stated that the Defendant called him at around one o'clock on the afternoon prior to the murder to ask if Fisher would be in town that evening because "he thought there may be a little trouble and just might need to make bond." Fisher testified that the Defendant told him that he might get in trouble for an assault and would call him if he needed him. Fisher stated that the Defendant called him later that day, around six or seven o'clock in the evening, and told him that he was on his way to turn himself in because someone had been shot.

On cross-examination, Fisher stated that the Defendant rented property from Fisher and that some of that property was subleased to the victim. Fisher testified that he was due some rent money on the property that was subleased by the victim. Fisher also stated that the Defendant told him that he was going to the police station because he had shot someone's door, but that he did not use the

---

[1]There was some confusion as to whether this man's name was Anthony Gooch or Anthony Williams.

words murder or homicide.

Mark Reynolds, an officer with the Dyersburg Police Department, testified that he was called to the shooting scene on December 4, 2001, and that he tried to locate any witnesses among the people gathered there. Officer Reynolds testified that, later in the investigation, he learned that Josh Garrett was a passenger in the Defendant's minivan at the time of the shooting. Garrett took the officer to a location where Garrett said he disposed of the murder weapon, and, there, the officer located a .357 handgun in a ditch. Officer Reynolds stated that the gun had one spent round in the chamber and that he found a "live" cartridge on the road near where the weapon was found.

Billy Williams, an officer with the Dyersburg Police Department, testified that he was called to assist in investigating the shooting. Officer Williams stated that he interviewed the Defendant at eight o'clock on the evening of the shooting. The officer testified that he noticed that the Defendant was "very upset, very nervous, and just basically . . . shaken up." The officer informed the Defendant of his Miranda rights, after which the Defendant told the officer that "he had been into it with [the victim]" and that he stopped his minivan next to the victim's car and words were exchanged. The officer stated that the Defendant told him that he was asking the victim for money and that the victim said, "The only way you'll get some money out of me is to shoot me in the head." Officer Williams testified that the Defendant stated that he thought the door was about to open "or he saw [the victim] move, and he fired two shots" and then "sped off." The officer stated that the Defendant told him that he never saw the victim with a gun.

The officer testified that the Defendant told him that Josh Garrett and Billy Thompson, Jr., were in the car with him at the time of the shooting. Officer Williams testified that Garrett told him that Garrett had a 9-millimeter handgun, and the investigation also revealed that the Defendant had a weapon. The officer testified that, once Garrett was released, he retrieved his 9-millimeter gun and turned it into the police. On cross-examination, the officer stated that he knew from the beginning of the investigation that there was an allegation that the victim began to open his door prior to the shooting. The officer also admitted that the Defendant told him that the victim's car "cut us off" prior to the two cars stopping at the stop sign and that the Defendant told him that there were two guns, "a 9 [millimeter] and a .357," in the car at the time of the shooting. Officer Williams testified that the Defendant told him that he saw the victim reach for something prior to the shooting. The officer testified that the Defendant told him that the victim was making threats to his life. The officer also stated that he was aware that two Dyersburg residents complained to police that the victim broke into their apartment and threatened them with a gun on December 12, 2000. Officer Williams testified that he knew the victim's mother because she was an officer with the Ripley Police Department.

The Defendant called Tammy Denise Smith who testified that she knew the Defendant from a business that he owned and operated. Smith testified that she also knew the victim for approximately two years prior to his death. Smith stated that the victim told her on the day of the murder that, when he found the Defendant, he was going to kill him. She testified that the victim had a reputation for violence in the community. Smith testified that she told the Defendant that she

heard the victim threaten the Defendant's life. Smith stated that, on one occasion, she saw the victim pull a gun on the Defendant's brother and "just poin[t] the gun at him . . . ." On cross-examination, Smith admitted that she did not mention her conversation with the victim, in which he threatened the Defendant's life, when she testified on the Defendant's behalf at any previous hearings.

Natasha Spain, the victim's girlfriend, testified that she knew the Defendant and that she was living with the victim at the time of his death. Spain testified that she was working at the time of the murder and that the victim had driven her to work. She stated that the victim told her on the day of the murder that he was going to go to Ripley and get a gun, and Spain understood the victim to mean that he was going to get the gun "to take care of a problem" that he was having with the Defendant. Spain stated that she told the victim to stay away from the Defendant. On cross-examination, Spain admitted that, shortly after the murder, she told investigators that the Defendant called her prior to the shooting, while she was with the victim, and asked her to "[p]ut your b**** a** n**** on the phone," referring to the victim. She stated that the victim spoke with the Defendant, who was asking the victim for money, and he told the Defendant to subtract the money that he owed the Defendant from the money the Defendant owed him and then inform him of the balance.

Kim Floyd testified that she told the Defendant that the victim was a violent and dangerous person prior to the night of the shooting.

Billy Ray Thompson testified that he was a passenger in the minivan driven by the Defendant on the night of the shooting. He testified that he was sitting behind the driver in the back seat and that, in addition to the Defendant, two other men, Josh Garrett and Dennis Akins, were in the minivan. Thompson testified that the Defendant did not mention the victim while they were in the car together prior to the shooting. Thompson stated that they saw the victim's car at a four-way stop and that the Defendant backed the van up to the victim's car and the two men started talking. He said that the Defendant asked the victim for money and the victim responded, "If you can do your math, then you would know that I don't owe you [anything]," and the victim got upset and "started hollering." Thompson stated that the Defendant was not upset at all. Thompson testified that he saw the victim reaching "on the side of him like he was [getting ready to] get a gun." Thompson said that the victim opened his driver's side door halfway and looked as if he was going to get out of his car. Thompson testified that he thought that the victim was about to "talk crazy, or shoot at us, or something." He testified that the victim previously "pulled a gun" on him one week prior to the shooting.

On cross-examination, Thompson testified that he heard the victim tell the Defendant, "To get your money, you're go[ing to] have to put one in my head" and that, shortly thereafter, he heard two gunshots and the Defendant drove away. Thompson stated that the Defendant fired the gun. Thompson stated that the Defendant then immediately called the police and said, "I just shot someone and I need for y'all to come meet me on the highway because he's still chasing me."

The Defendant next called Officer Jim Gray to testify again. Officer Gray stated that, when

he examined the victim's vehicle at the crime scene, it was in park. The officer testified that the bullet hole in the driver's side door was significantly lower than where the victim's torso would have been located had he been sitting behind the steering wheel.

Carey Brown Haynes testified that he was familiar with both the Defendant and the victim. Haynes testified that the victim shot him in the left ear and the head and that the Defendant was aware of this. Haynes stated that, when the victim shot him, he was sitting at his house and the victim "came and kicked in the door of the house" and then shot him. On cross-examination, Haynes testified that he told the police that the victim shot him.

Officer Billy Williams was called again to testify and stated that he interviewed Haynes when Haynes was shot on December 12, 2000. He stated that Haynes never told him that the victim shot him, and only told him that the individual who shot him had on a mask and that Haynes did not know who that individual was. Officer Williams stated that, during the investigation, the victim was a possible suspect and was interviewed, but there was insufficient evidence to charge him with the crime. The officer stated that when Haynes was shot he was living with both the Defendant and the victim. Officer Williams testified that he did not execute a search warrant in that case and denied that it was because he had a good working relationship with the Defendant's mother.

The Defendant testified on his own behalf that he owned and operated a business named Auto Source for several years and that he owned it on the day of the shooting. The Defendant testified that he knew the victim for approximately three years prior to the shooting. The Defendant stated that, prior to the shooting, the victim was "having words and disagreements" with at least six of their mutual acquaintances. The Defendant testified that, before the shooting, he learned from "quite a few people" that the victim was making threats against his life. Specifically, the Defendant was told that the victim said, "If he s[aw] me, he was go[ing to] kill me." The Defendant testified that these threats concerned him and he felt that the victim really was going to kill him. The Defendant said that, on the day of the shooting, Tammy Smith told him that the victim told her that the victim was going to kill the Defendant. The Defendant testified that he had been told that the victim was involved in previous shootings.

The Defendant testified that, on the night of the murder, the victim's vehicle was blocking his vehicle and that he put his vehicle in reverse. The Defendant said that the victim then backed up the victim's vehicle so that the two cars were side by side. The Defendant testified that, after the victim blocked his car, the Defendant knew there was "going to be trouble." The Defendant testified that the victim asked him, "What's up" and did not appear "upset or anything." The Defendant stated that he wanted to see what was "going on" because people had been telling him that the victim was going to try to kill him, but he had seen the victim multiple times that evening and he did not attempt to stop the Defendant. The Defendant stated that the victim then "got real upset" but that he did not know why. He testified that the victim did not say anything about putting a bullet in the victim's head as the other witness said but said that there was "go[ing to] be some killin[g]."

The Defendant stated that the victim appeared to be excited and "started reachin[g]" for a

gun, so the Defendant reached for his gun. The Defendant stated that he never saw a gun in the victim's hand but knew that he regularly carried a weapon. The Defendant stated that, after he reached for his gun, the Defendant immediately fired a shot and, as he was driving off, he fired another shot. He said that he fired his gun at the victim just to warn him and that he did not know that the victim had been shot when he drove away. The Defendant testified that he then called the police and told them that he thought that he might have shot someone and that someone might still be following him. The Defendant said that he told police that he had two guns in the minivan and that he left the guns in the minivan. The Defendant stated that he carried a gun with him because he often carried large sums of money from his store.

On cross-examination, the Defendant stated that he and the victim formerly lived in close proximity to each other. The Defendant stated that, five days prior to the murder, he and the victim drove to Jackson, Tennessee, together and did not have any problems. The Defendant testified that, on the day of the murder, he picked up his cousin, Josh Garrett, and that Garrett had a gun "on him." The Defendant stated that the two men saw the victim a couple of times while driving around and, since the victim did not stop them, they assumed that there was not going to be a problem, so they placed both guns on the floor of the minivan. The Defendant testified that, when he and the victim were in their respective vehicles next to each other, the victim stated that he did not have a problem with the Defendant and then told the Defendant that he was friends with Officer Williams and could not get in trouble. The Defendant stated that, during this time, he "wasn't saying a word." The Defendant admitted that there was some discussion about money, stating, "I asked him about the money after he was starting to get riled up."

The Defendant stated that he asked the victim for money because "[a]t that point in time, I didn't think he had a gun." The Defendant testified that the victim then said "something about some kill[ing]" and the victim reached down inside his car. The Defendant stated that the victim put his cell phone on the dash, put the car in park, opened the door and was reaching down when the Defendant fired the first shot. The Defendant explained that he did not know where the victim was when he fired the second shot because he was driving off as he fired it. The Defendant testified that he did not know if there was anything that prevented him from driving off prior to shooting the victim. The Defendant stated that, when he left the scene of the shooting, he drove the opposite direction from the sheriff's department. The Defendant testified that he left the minivan and asked someone to come pick him up because he thought that someone was following the minivan. He stated that he left his cousin and another man in the minivan and that he left the guns in the minivan.

The State called one rebuttal witness, Rita M. Burnett, who was the victim's mother and is an officer with the Ripley Police Department. Officer Burnett testified that she had known Officer Williams since 1999 and that he called her one time because her son, the victim, was implicated in a shooting. Officer Burnett stated that she has four sons, two of whom are in prison, the victim, and a fifteen year old son. The officer testified that the victim would "physically figh[t]," but that she had never known him to be charged with using a weapon.

Based upon this evidence, the jury convicted the Defendant of second degree murder, as a lesser-included offense of premeditated first degree murder. The Defendant appeals, contending that the evidence is insufficient to sustain his conviction.

## II. Analysis

The Defendant contends that the evidence is insufficient to support his second degree murder conviction because the proof shows that he acted in self-defense. The State argues that the evidence is sufficient to support his conviction. We agree with the State.

When an accused challenges the sufficiency of the evidence, "'the standard for review by an appellate court is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" State v. Smith, 24 S.W.3d 274, 278 (Tenn. 2000) (quoting State v. Buggs, 995 S.W.2d 102, 105 (Tenn. 1999)); see Tenn. R. App. P. 13(e); Jackson v. Virginia, 443 U.S. 307, 324 (1979). In determining the sufficiency of the evidence, this Court should not re-weigh or re-evaluate the evidence. Smith, 24 S.W.3d at 279. Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. Buggs, 995 S.W.2d at 105. Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. Liakas v. State, 286 S.W.2d 856, 859 (Tenn. 1956). This Court must afford the State of Tennessee the strongest legitimate view of the evidence contained in the record, as well as all reasonable inferences which may be drawn from the evidence. State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. Id.

A conviction for second degree murder requires proof that the defendant unlawfully and knowingly killed another. See Tenn. Code Ann. §§ 39-13-201, - 210(a)(1) (1997 & Supp. 2002). A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result. Tenn. Code Ann. § 39-11-302(b) (1997 & Supp. 2002). Tennessee's self-defense statute, Tennessee Code Annotated, section 39-11-611(a) (1997 & Supp. 2002), provides as follows:

> A person is justified in threatening or using force against another person when and to the degree the person reasonably believes the force is immediately necessary to protect against the other's use or attempted use of unlawful force. The person must have a reasonable belief that there is an imminent danger of death or serious bodily injury. The danger creating the belief of imminent death or serious bodily injury must be real, or honestly believed to be real at the time, and must be founded upon reasonable grounds. There is no duty to retreat before a person threatens or uses force.

The State has the burden of negating any defense raised by supporting evidence. Tenn. Code Ann. § 39-11-201(a)(3) (1997 & Supp. 2002). It is well-settled that whether an individual acted in self-defense is a factual determination to be made by the jury as the sole trier of fact. State v. Ivy, 868 S.W.2d 724. 727 (Tenn. Crim. App. 1993). It is within the prerogative of the jury to reject a claim of self-defense. State v. Goode, 956 S.W.2d 521, 527 (Tenn. Crim. App. 1997).

The Defendant contends that the evidence shows that he acted in self-defense because he reasonably believed the force he used was necessary to protect himself from the victim, who he believed had threatened to kill him, who had assaulted others, and who he thought was reaching for a gun at the time the Defendant shot him. In response, the State points to the abundance of evidence refuting self-defense, including: that the Defendant called his bail bondsman and told him that there would be trouble that evening in the form of an assault; that the Defendant and his passenger were both armed; that the victim was unarmed; that the Defendant could have driven away prior to the shooting; that the Defendant requested money from the victim and, after the victim refused, the shots were fired; and that the Defendant shot at the victim twice.

We believe the evidence is sufficient to warrant the jury's conclusion that the Defendant acted "knowingly." "'A person can act knowingly irrespective of his or her desire that the conduct or result will occur.'" State v. Kelley, 34 S.W.3d 471, 478 (Tenn. Crim. App. 2000) (quoting State v. Gray, 960 S.W.2d 598, 604 (Tenn. Crim. App. 1997); State v. Rutherford, 879 S.W.2d 118, 120 (Tenn. Crim. App. 1993)). Viewed in the light most favorable to the State, the evidence shows that the Defendant stopped next to the victim's car and asked him for money. As the argument escalated, both the Defendant and the victim became angry. The Defendant reached to the floor, picked up his gun and fired twice at the victim, who was unarmed. The victim's car was far enough away from the Defendant that he could have driven away prior to the shooting. One bullet hit the side of the car and the second one hit the victim in his head. Accordingly, we find that the jury did not err when it found that the Defendant acted knowingly.

Furthermore, there was ample evidence for the jury to reject the Defendant's claim of self-defense. The credibility and weight to be given to a witness's testimony are issues to be resolved by the trier of fact. State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). The evidence presented showed that Defendant did not have a reasonable belief that force was immediately necessary to protect himself. The Defendant admitted that he did not know if there was anything blocking his ability to leave the potentially dangerous situation prior to the shooting. The evidence is sufficient for a jury to reject the Defendant's claim of self-defense and to support the Defendant's conviction of second degree murder.

### III. Conclusion

In accordance with the foregoing, we conclude that there is sufficient evidence to sustain the Defendant's conviction for second degree murder. Therefore, the judgment of the trial court is AFFIRMED.

_____
ROBERT W. WEDEMEYER, JUDGE